[No. B110830. Second Dist., Div. Two. July 16, 1998.]

FIRST STREET PLAZA PARTNERS et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

652

**COUNSEL**

O'Donnell & Shaeffer, Pierce O'Donnell, Suzanne Tragert, Belynda Reck and Clark Kelso for Plaintiffs and Appellants.

Crowell & Moring, Randall L. Erickson, Donald E. Bradley and Deborah E. Colander as Amici Curiae on behalf of Plaintiffs and Appellants.

Irell & Manella, Steven L. Sloca, Craig Varnen, Harris, Baird, & Abraham, Rita J. Baird and Ansylene A. Abraham for Defendant and Appellant.

Dovel & Associates and Gregory S. Dovel as Amici Curiae.

---

**OPINION**

**ZEBROWSKI, J.**—Plaintiff in this case is First Street Plaza Partners, a limited partnership, and its three corporate members (collectively plaintiff). Defendant is the City of Los Angeles (the City). Plaintiff and defendant negotiated for several years for a contract to develop a parcel of City-owned land. In order for the City to enter into such a contract, the contract formation procedures specified in the City's charter must be followed. Although the parties' negotiations were lengthy and elaborate, the parties never completed the contract formation procedures in the City's charter. Eventually the City decided not to proceed with the project.

Plaintiff then sued. Plaintiff's complaint alleged breach of express and implied contract, estoppel, unjust enrichment and breach of fiduciary duty. The trial court granted summary judgment for the City. On appeal, plaintiff urges two theories.[1] First, although negotiations were not broken off until 1994, and although proposed contract documents were not completed until 1993, plaintiff asserts that a binding contract was formed when the City approved a report from its CAO (chief administrative officer) in 1991

---

[1]Plaintiff's opening brief initially states that plaintiff appeals from the dismissal of its breach of fiduciary duty theory as well as from dismissal of its breach of contract and estoppel theories, but breach of fiduciary duty is not briefed. Plaintiff's reply brief claims only a right to trial on the breach of contract and estoppel claims. We therefore conclude that plaintiff appeals only on the two theories briefed: breach of contract and estoppel.

detailing the "scope and direction" of the proposed project. Second, plaintiff asserts that the City is equitably estopped from denying the formation of a contract.

Two questions are thus presented on plaintiff's appeal: One, can the provisions of a city's charter (which itemize specific steps necessary for that city to enter into a contract) be satisfied by implication or by procedures different from those specified in the charter? Two, if the requirements of a city's charter for formation of a contract are not satisfied, can the city nevertheless be equitably estopped from denying that a contract has been formed? Even though plaintiff presents a case with sympathetic appeal, the legal answer to both of the determinative questions is no. Summary judgment was therefore correctly entered in favor of the City. In the published portion of this opinion, that ruling will be affirmed.

The City has also appealed, contesting the trial court's denial of its motion for attorney's fees. In the unpublished portion of this opinion, that ruling will also be affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

In 1986, the City decided that it needed additional office space for City employees because the City had outgrown City Hall and its annexes and had been housing employees in leased office buildings. In October of 1986, the city council approved a memorandum of understanding between the City and the community redevelopment agency for preparation of a request for proposal (RFP) in response to which private developers would submit proposals to meet the City's objectives. In March of 1987, the City's CAO issued the RFP to qualified developers. The RFP contemplated a project called "First Street North," consisting of an office tower for the City's use plus commercial, residential, community and retail space to be built on 11 acres of City-owned land located between the civic center and Little Tokyo. In August of 1988, the city council entertained bid proposals from three developers, and subsequently authorized the CAO to enter into exclusive negotiations with plaintiff for development of the site.

During the next several years, the parties engaged in extensive and detailed negotiations. The proposed details of the project varied from time to time, but in general the project called for periodically adjustable ground rent exceeding $1 million per year, a high-rise city office building, over 300 housing units, a hotel with 450-500 rooms, subterranean parking for over 2,000 cars, rehabilitation of the San Pedro Firm Building, a large child care facility, a geriatric counseling center, expansion of the Japanese American

National Museum, integration of the Temporary Museum of Contemporary Art into the project, a fine arts contribution equal to 1.5 percent of development costs, and other features. The project was expected to be funded by issuance of "certificates of participation"—instruments similar to bonds.

Both the City and plaintiff expended considerable sums negotiating and developing the project, although plaintiff's expenditures dwarfed those of the City. In its first amended complaint, plaintiff contends that it expended over $12 million in project development costs. This money was spent on tasks such as two environmental impact reports (EIR's), permit procedures, zoning and height district changes, the processing of code amendments to increase the permissible floor/area ratio on the property, a street vacation map, tract maps for subdivision of air rights, and various other land use and environmental review procedures. These procedures were performed in whole or in part while the negotiations were in progress, and consequently in the absence of formal contract documents.

The City contends that plaintiff made these significant expenditures while the negotiations were still in progress because plaintiff insisted on delivery of the property in "buildable" condition within six months after contract. The City claims that it believed that necessary environmental and land use review procedures would take longer than six months, and that it was consequently unwilling to commit to deliver the property in "buildable" condition within six months of contract formation unless certain environmental and land use approvals were obtained in advance of contract formation. As a consequence, extensive procedures went forward without the formation of a contract in the manner specified in the City's charter, and plaintiff incurred considerable expense. Whatever the cause of these expenses, it is the fact of these expenses, coupled with the eventual termination of the negotiations, which appears to form the primary impetus for this litigation. The controlling law discussed below, however, provides that a chartered city such as the City cannot incur contract-based liability unless the contract formation provisions of the City's charter are satisfied. The parties' precontract environmental and land use approval activities therefore need not be described in more detail.

The City's charter charges the CAO with keeping the "Mayor and the Council advised of the condition, finances and future needs of the City." In discharge of these duties, and as the negotiations progressed, the CAO periodically reported in writing to the city council on status and developments. One such report, more detailed than the others, was dated August 20, 1991, and was transmitted to the mayor and city council on August 22, 1991. Plaintiff and two amici curiae, the Associated General Contractors of California (AGC) and the Building Owners and Managers Association of California (BOMA Cal), contend that this 1991 report (the CAO Report) memorializes the terms of a contract which legally obligated the City to proceed

with the project. The actual wording of the CAO Report, however, disproves this contention.

The heading of the CAO Report notes as its subject "Status Report - First Street North Project." It begins with a "SUMMARY," which notes that "Agreement has been reached on most project negotiation issues. However, several issues remain open and require resolution before project documents can be completed. . . . These issues are being discussed ·with the developer and closure is expected within the next 90 days." The SUMMARY continues: "At this time, we recommend that the Council give conceptual approval to the issues negotiated to date and provide resources needed to finalize project documents. Recommendations regarding the remaining open issues will be made to the Mayor and Council within 90 days. [¶] A comparison of the Council-directed scope, the anticipated scope resulting from project negotiations and the status of major deal points is included in Attachment A. Open issues are noted with an asterisk." The SUMMARY proceeds through a report about progress on such matters as the EIR, a general plan amendment, a height district change, zone change, groundwater testing, the appointment of bond counsel, etc., and then states: "Extensive work is now required to complete the detailed project documents. Six major documents will be prepared and delivered for Council review when the final report is forwarded for Council consideration. These include the Master Agreement, the Tower Agreement, the Form of Ground Lease, the Hotel Ground Lease, the Form of Reciprocal Easement Agreement and the Parking Agreement." The SUMMARY then explains that "The City Attorney does not have the staff resources necessary to complete negotiations and draft final legal documents" and that most of the legal work to that date had consequently been done by plaintiff's counsel. The SUMMARY then recommends that "bond counsel's scope of work be extended to include review and redrafting responsibility for the major legal documents for the project." The SUMMARY concludes with several recommendations, the first of which is "That the Council, subject to the approval of the Mayor . . . Approve the negotiated scope and direction of the First Street North Project as presented in the Addendum to this report and in Attachment A, and authorize the City Administrative Officer to proceed to conclude negotiations, subject to Mayor and Council review of and action on final documents." Additional recommendations relate to financial arrangements necessary to conclude the negotiations.

The "ADDENDUM" to the CAO Report is headed "STATUS OF PROJECT NEGOTIATIONS," and discusses the history of the project, expected construction costs for the City Office Tower alone of over $100 million, plans to raise funds through certificates of participation issued by the Municipal Improvement Corporation of Los Angeles, the disparity between escalation

in the Los Angeles/Long Beach Consumer Price Index and escalation in building costs, the negotiations with plaintiff regarding an "appropriate method of escalating base building costs," and other financial considerations. The ADDENDUM notes that "Because of the fixed-price nature of the contract, extra care has been taken in defining what should be included in the building specifications. The City Office Tower building specifications are still under discussion." The ADDENDUM discusses the details of the long-term (99-year) ground leases contemplated, projected related costs, etc. It explains how a newly imposed requirement for conversion of 20 additional residential units into low-income housing "had a negative effect on the residential portion of the project," and that the City negotiating team had considered "a request by the developer to offset this negative effect by adding office space to Tower B." The ADDENDUM notes that the amount of additional office space necessary "will be adjusted, if necessary, as final budget and financial figures are received by the developer" and that the "results are to be submitted to Mayor and City Council for approval." Regarding the proposed hotel on the site, the ADDENDUM states that "Completion of negotiations for the hotel portion of the project remains open pending review of the Hotel proposal by the City's financial consultant and completion of negotiations with respect to the hotel ground rent." The ADDENDUM continues to note other open issues, such as the allocation of costs of off-site improvements, the need to identify the amount of certain fees "prior to consideration of the final project documents," and the need for the council to consider amendments to certain ordinances when considering the "final project documents."

Attachment A to the CAO Report is in chart form and compares the specifications of the RFP with the "current position(s)" of the negotiations. The "status" of these various issues is then noted in a final column, with some entries reading "negotiated," some reading "agreed in concept," others stating "open," and others noting specific details awaiting resolution.

On November 13, 1991, the city council adopted a resolution approving, and forwarding to the mayor for his approval, "the negotiated scope and direction of the First Street North Project as presented in the CAO report" and authorizing "the CAO to proceed to conclude negotiations, subject to Mayor and Council review of and action on final documents." Following the adoption of this resolution, there was some celebrating among city council members, members of the CAO's staff, and negotiators for the plaintiff. Plaintiff emphasizes these events, and they do suggest that those concerned expected the project to go forward. The contemporaneous expectations of those involved, however, are not germane to the question of whether the requirements of the City's charter had been satisfied and, as discussed

below, the law provides that the City cannot be bound to a contract by estoppel. The details of the celebrating therefore need not be set forth in more detail.

On November 20, 1991, the acting mayor sent a letter to the city council concurring in the council's resolution and approving "the negotiated scope and direction of the First Street North Project as presented in the City Administrative Officer's (CAO) report dated August 20, 1991," and authorizing "the CAO to proceed to conclude negotiations."[2] Following these events, plaintiff expended additional sums to prepare and to process a second EIR, an amendment to the general plan, variances, a zoning consistency ordinance amendment, conditional use permits, a street vacation map, tract maps, etc.

In 1993, the city council was presented with a new economic evaluation of the project and potential alternatives in view of then depressed market rates for office space in downtown Los Angeles. The council consequently began a reevaluation of the proposed project. Work had concurrently been continuing on preparation of the "final report" and "final documents" projected in the CAO Report. These final documents were eventually presented to the city council on October 6, 1994. The council then decided not to go forward and rejected the proposed contract documents. After unsuccessful efforts to negotiate a scaled-down version of the project, the City terminated negotiations with plaintiff. This lawsuit followed.

Plaintiff's first amended complaint (FAC), after generally alleging the nature and history of the negotiations along the lines set forth above, contains sections entitled "Politics Intervene and the City Does an About-Face," "Mayor Riordan Wields the Ax," and "The City Council Gets in Line Behind the Mayor." These sections allege that immediately after taking office and "primarily for reasons of partisan politics," Mayor Riordan "and his henchmen" began a campaign to "discredit" the project and "to get rid of" plaintiff. The FAC alleges that the mayor publicly announced his opposition to the project and recommended termination of negotiations with plaintiff because the Mayor believed that, in view of the contemporaneous condition of the real estate market, the City could lease better and cheaper office space. The FAC alleges that Mayor Riordan was misinformed and

---

[2]Plaintiff's briefs state that "Mayor Bradley" acted as though there was a binding contract between plaintiff and the City. However, the letter concurring in the city council's approval of the "scope and direction" of the negotiations and authorizing the CAO "to conclude the negotiations" was signed by Acting Mayor John Ferraro.

incorrect in this analysis, but that he nevertheless convinced then Councilmember Yaroslavsky—a key councilmember because he chaired the budget and finance committee—of the merits of this view.[3] Negotiations were then conducted with a view to scaling down the project, but these negotiations failed, setting the stage for the council's vote to terminate negotiations with plaintiff. Plaintiff claims out-of-pocket expenditures of over $12 million and total damages of over $26 million.

The trial court granted the City's motion for summary judgment on the grounds that the contract formation requirements of the City's charter had not been satisfied, and that under these circumstances the City could not be bound to a contract by estoppel.

## II. DISCUSSION AS TO PLAINTIFF'S APPEAL

### a. *Standard of review.*

 " 'Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. ([Code Civ. Proc.,] § 437c, subd. (c).) We review the trial court's decision to grant [defendant] summary judgment de novo.' [Citation.] We are governed by the 1993 amendments to Code of Civil Procedure section 437c; [defendant's] burden 'could be met only by showing "that one or more elements of the cause of action . . . *cannot be established*, or that there is a complete defense to that cause of action." (§ 437c, subd. (o)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to show "that a triable issue of one or more material facts exists as to that cause of action . . . ." ' [Citation.]" (*Lopez* v. *Superior Court* (1996) 45 Cal.App.4th 705, 713 [52 Cal.Rptr.2d 821].) The reviewing court conducts a de novo examination to see whether the moving party is entitled to summary judgment as a matter of law or whether there are any genuine issues of material fact. (*Mata* v. *City of Los Angeles* (1993) 20 Cal.App.4th 141, 147 [24 Cal.Rptr.2d 314].)

In this case none of the facts relevant to determination of the motion for summary judgment are disputed. The task, therefore, is to determine, de novo, whether plaintiff's claims lack merit as a matter of law.

### b. *Chartered cities versus general law cities: chartered cities have control over "municipal affairs."*

 State statutes generally specify the powers possessed by California cities. (cf. Cal. Const., art. XI, § 2, subd. (a).) The California Constitution,

---

[3]At oral argument, plaintiff argued in support of its estoppel theory that the City had saved millions of dollars by not going forward with the project.

however, authorizes a city to adopt a city charter (Cal. Const., art. XI, § 3, subd. (a)), and hence become a "chartered city." (See Gov. Code, §§ 34101, 34450 et seq.) The Government Code consequently classifies cities as either "chartered cities" or "general law cities."[4] (Gov. Code, §§ 34101, 34102; see, e.g., *South Bay Senior Housing Corp.* v. *City of Hawthorne* (1997) 56 Cal.App.4th 1231, 1235-1236 [66 Cal.Rptr.2d 99].) General law cities are those that have not adopted a charter. Such cities remain subject to state statutes. (See, e.g., *South Bay Senior Housing Corp.*, *supra*, 56 Cal.App.4th 1231 [general law city must comply with state statute specifying requirements for entering into contract].)[5]

A city that has adopted a charter also remains subject to state statutes, except with regard to "municipal affairs" governed by the charter. (Cal. Const., art. XI, § 5.) The purpose of adopting a city charter is to move control over "municipal affairs" from the state legislature to the local government. When a city adopts a charter, state statutes are generally displaced as to "municipal affairs" covered by the charter.[6] Such "municipal affairs" are then " 'unaffected by general laws on the same subject matters.' " (*City of Santa Monica* v. *Grubb* (1966) 245 Cal.App.2d 718, 724 [54 Cal.Rptr. 210], quoting *City of Roseville* v. *Terry* (1958) 158 Cal.App.2d 75, 76 [322 P.2d 44]; cf. Cal. Const., art. XI, § 5 [allowing "city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs . . . ."].)

The constitutional provision authorizing the shift of control over "municipal affairs" from the state to a local municipality by the local municipality's adoption of a charter has been called the "home rule" provision (see, e.g., *City of Los Angeles* v. *State of California* (1982) 138 Cal.App.3d 526, 532 [187 Cal.Rptr. 893]), and a city charter "has . . . been aptly termed the local constitution of the city." (*In re Pfahler* (1906) 150 Cal. 71, 82 [88 P.

---

[4]A third possible category consists of cities organized before the adoption of the California Constitution in 1879 which have not chosen to change their form of organization. (*Kennedy* v. *Miller* (1893) 97 Cal. 429, 433 [32 P. 558]; cf. Gov. Code, § 34400 et seq.)

[5]A county may also adopt a charter. (Cal. Const., art. XI, § 3, subd. (a).)

[6]With some possible exceptions not relevant here. (See, e.g., *Tri County Apartment Assn.* v. *City of Mountain View* (1987) 196 Cal.App.3d 1283, 1293, 1298 [242 Cal.Rptr. 438] [timing of landlord-tenant transactions a matter of statewide concern governed wholly by state law notwithstanding that subject might be characterized as a municipal affair].) State law on matters of statewide concern has also been found to take precedence in some other circumstances. (See, e.g., *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 292-295 [32 Cal.Rptr. 830, 384 P.2d 158] ["labor relations" a matter of statewide concern, state law may impinge "to a limited extent" on a city's "right to manage and control its fire departments"]; *Dairy Belle Farms* v. *Brock* (1950) 97 Cal.App.2d 146, 151-158 [217 P.2d 704] ["statewide policy of milk price stabilization" and "proper regulation of the milk industry" are matters of statewide concern taking precedence over "the awarding of contracts" by "charter provisions for sealed bids"].)

270]; see also *Domar Electric, Inc.* v. *City of Los Angeles* (1994) 9 Cal.4th 161, 170 [36 Cal.Rptr.2d 521, 885 P.2d 934] [cardinal principle is that charter is the supreme law of the city, subject only to constitutional limitations and preemptive state law].)

c. *The City's charter controls "municipal affairs," which includes the formation of City contracts.*

 The City is a chartered city with maximum allowable control over municipal affairs. (L.A. City Charter, art. I, §§ 2(4) [tracking language of Cal. Const., art. XI, § 5]; 2(8) [authorizing City to "exercise the fullest measure of local self-government not in conflict with the Constitution and laws of the State of California"]; see also *Murphy* v. *City of Piedmont* (1936) 17 Cal.App.2d 569, 572 [62 P.2d 614] [applying provisions of former Cal. Const., art. XI, § 6, now found in § 5; holding city may avail itself of constitutional privilege of freeing itself from state control over municipal affairs by an express declaration in a city charter].) The term "municipal affairs" has no exact definition. Instead, the question of whether a particular matter is a "municipal affair" must "be determined upon the facts and circumstances surrounding a given case." (*City of Los Angeles* v. *State of California, supra,* 138 Cal.App.3d 526, 532; see also *Southern Pacific Pipe Lines, Inc.* v. *City of Long Beach* (1988) 204 Cal.App.3d 660, 668 [251 Cal.Rptr. 411] [because Constitution does not define "municipal affairs," the court must decide under the facts of each case whether the subject matter at issue is a municipal affair or a matter of statewide concern].)

 It was long ago decided, however, that the manner in which a city is empowered to form a contract is generally a "municipal affair" which can be controlled by the terms of its charter. (See, e.g., *Loop Lumber Co.* v. *Van Loben Sels* (1916) 173 Cal. 228, 232 [159 P. 600] [the making of contracts for public improvements is a "municipal affair"]; cf. *Domar Electric, Inc.* v. *City of Los Angeles, supra,* 9 Cal.4th 161, 170-171 [expenditure of public funds on public works is a municipal affair].) Thus if a city charter specifies the manner in which that city may enter into a contract, the terms of the charter control over otherwise applicable state law. (*Dairy Belle Farms* v. *Brock, supra,* 97 Cal.App.2d 146, 155 [generally, manner of letting contracts is a municipal affair as to which a "home rule" charter is superior to general law]; *Loop Lumber, supra,* 173 Cal. 228, 232 [when charter makes provision regarding a municipal affair, it is the supreme law, paramount to any law enacted by the state Legislature; this proposition has been so often stated "as to have become practically elementary"].)

The Charter of the City of Los Angeles contains a section which generally specifies the procedures according to which the City may be bound to a

contract. (L.A. City Charter, art. XXVIII, § 385 (Section 385).) A related section specifies that any contract calling for the receipt or payment of money for a period of more than three years must be approved by the city council. (L.A. City Charter, art. XXVIII, § 390 (Section 390).) The manner in which the City may be bound to a contract is therefore controlled by the terms of its charter.

 d. *Section 385.*

In 1991, at the time of the CAO report, which plaintiff contends was accepted by the city council and mayor as a contract, Section 385 provided in pertinent part as follows: "Every contract involving an expenditure of more than five hundred dollars ($500) shall . . . be made in writing, the draft whereof shall be approved by the board, officer or employee authorized to make the same, and signed on behalf of the City by the Mayor, or some other person authorized thereto by resolution of the Council in the case of a contract authorized by Council, or, in the case of other contracts, by the board, officer or employee, as the case may be, authorized to make the same, provided, however, that the approval of the City Attorney of any such contract as to form . . . shall be endorsed thereon before the Council or such board, officer or employment [*sic*] shall have the power to approve the same."[7]

The language of Section 385 is mandatory ("shall"), and plaintiff's briefing agrees that four requirements are specified: "(1) a writing containing all material terms of the [proposed project], (2) approved by the City Council,[8] (3) signed by the Mayor with (4) the City Attorney's approval as to form . . . ." Plaintiff and the two amici curiae contend, however, that these four requirements were satisfied "by the City's adoption of the 35-page, single-spaced CAO Report in November 1991."

 e. *The requirements of Sections 385 and 390 were not satisfied by the CAO Report.*

Even though the provisions of a city charter displace state statutes which would otherwise be applicable to municipal affairs, "[t]he provisions of a charter are the law of the State and have the force and effect of legislative enactments." (Cal. Const., art. XI, § 3, subd. (a).) ■ As laws of the state, charter provisions are interpreted according to the normal rules of

---

[7]Section 385 has since been reworded somewhat. The effect of that rewording is not involved on this appeal.

[8]To the extent that this requirement may be considered not found in Section 385, it is in any event supplied by Section 390, which requires city council approval for any contract calling for the receipt or payment of money for a period longer than three years.

statutory construction. (See, e.g., *United Assn. of Journeymen* v. *City and County of San Francisco* (1995) 32 Cal.App.4th 751, 760 [38 Cal.Rptr.2d 280] ["Generally, the same principles of construction applicable to statutes apply to the interpretation of municipal charters." (Collecting cases discussing principle.)].) In construing a charter, the objective is to determine legislative intent, and the prime determinant is the plain meaning of the language of the charter. "Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history." (*Domar Electric, Inc.* v. *City of Los Angeles, supra,* 9 Cal.4th 161, 172.)

■ The Charter of the City of Los Angeles plainly mandates that a city contract of the type involved here must be signed by the mayor, be approved by the city council, and be approved as to form by the city attorney.[9] It does this by using the classic mandatory verb "shall." However, amicus curiae BOMA Cal, and plaintiff in its reply brief, raise an issue of legislative interpretation, to which the City has replied. The argument is that prior to 1911, the predecessor to Section 385 was structured a bit differently. It was then a long and rambling paragraph which stated that the City "shall not be, and is not bound by a contract . . . unless . . ." the city council publishes a notice, the contract is let to the lowest bidder, etc., followed by a series of "provided that" clauses regarding approval by the city council, signature by the mayor, approval as to form by the city attorney, etc. In 1911, this predecessor section was simplified by breaking out the bidding provisions and placing them into a new section (now Los Angeles City Charter, article XXVIII, section 386), and by restructuring the general contract formation requirements (now found in Section 385) into the present "shall be in writing, approved, signed, etc." form. The record contains no legislative history, evidence or authority indicating that the purpose of the 1911 amendment was anything other than to clarify and simplify the charter by stating the bidding requirements separately from the general contract formation requirements. Plaintiff and BOMA Cal nevertheless argue that the 1911 amendment establishes that current Section 385 is permissive only. This argument for a permissive-only construction cannot be accepted, for it is directly contrary to the plainly mandatory language ("shall") of Section 385. (See, e.g., *People* v. *Knowles* (1950) 35 Cal.2d 175, 181 [217 P.2d 1] [court cannot impute a meaning to a statute not rationally supported by its wording]; *Bruce M.* v. *Superior Court* (1969) 270 Cal.App.2d 566, 573 [75 Cal.Rptr. 881] ["shall" is mandatory].)

---

[9] Plaintiff argues that the requirement that the city attorney approve as to form should not be construed to allow the city attorney to "veto" a contract approved the city council and signed by the mayor, simply by refusing to approve the contract as to form. Whether or not this is correct, it is not an issue raised by the facts of this case.

As the facts recited above show, none of the acts which "shall" be done to form a contract with the City ever occurred. The CAO Report on its face was not a contract document presented for approval by the city council, approval as to form by the city attorney, or signature by the mayor. The city council and acting mayor approved only the "negotiated scope and direction" of the project as presented in the CAO Report, and expressly authorized further negotiations reported as necessary to finalize proposed contract documents. The CAO Report itself expressly states that "several issues remain open and require resolution before project documents can be completed," asks for funding to complete the contract documents, and advises the city council and mayor that they will later be presented with final contract documents for approval. The presentation of the CAO Report, and the approvals by the acting mayor and city council of the "scope and direction" reported in the CAO Report, did not constitute contract formation pursuant to Section 385 and Section 390 of the City's charter.[10] When the mayor and city council were presented with the actual contract documents, they rejected them.

---

[10]Plaintiff also argues that, despite its mandatory language ("shall"), the requirements of Section 385 need not be satisfied because the City's charter does not expressly *forbid* contract formation in a manner other than as specified in the charter. This proposition is suspect on its face since to accept it would render the contract formation requirements of section 385 a complete nullity. In support of its proposition, plaintiff relies on *Domar Electric, Inc.* v. *City of Los Angeles, supra,* 9 Cal.4th 161. *Domar Electric* concerned Section 386 of the City's charter, which generally requires the award of certain contracts to the lowest bidder. The question in *Domar* was whether the City could include in its bid specifications a requirement that a bidder engage in certain "outreach" measures to ensure widespread participation in subcontracting. The plaintiff in *Domar Electric* had submitted the lowest bid, but had failed to satisfy the outreach requirements in the bid specifications. Its bid consequently did not conform to the bid specifications, and was rejected for that reason. The court found the City's enforcement of the outreach requirements by rejecting nonconforming bids was permissible under the City's charter. *Domar*'s decision about what requirements could properly be placed into bid specifications has no application in the instant circumstances.

Plaintiff also misapplies *Domar*'s statements that charter provisions must be construed in favor of municipal power. (See, e.g., *Domar Electric, Inc.* v. *City of Los Angeles, supra,* 9 Cal.4th at p. 171 ["Charter provisions are construed in favor of the exercise of the power over municipal affairs and 'against the existence of any limitation or restriction thereon which is not expressly stated in the charter . . . .' [Citations.] Thus, '[r]estrictions on a charter city's power may not be implied.' "].) The issue in construing a charter is generally whether the charter has successfully effected "home rule" regarding a topic, and has thus displaced the "general law" which would otherwise apply. It is in this sense that a charter must be construed in favor of municipal power. The discussions of this concept, found in *Domar* and elsewhere, do not mean that a city's charter must be construed to give the city the "municipal power" to act in disregard of its own charter. To the contrary, *Domar* expressly states that "it is well settled that a charter city may not act in conflict with its charter" and that "[a]ny act that is violative of or not in compliance with the charter is void." (*Ibid.*) While it may be true that allowing a city to act in disregard of its own charter would, in one sense, give that city "more power," that is not the point of the discussions in *Domar* and elsewhere about "home rule" power over "municipal affairs."

f. *Dynamic Ind. Co. and related cases.*

The decision in *Dynamic Ind. Co.* v. *City of Long Beach* (1958) 159 Cal.App.2d 294 [323 P.2d 768] is close to, if not wholly, dispositive of plaintiff's claim that the CAO Report formed a contract between plaintiff and the City. The plaintiff in *Dynamic Ind. Co.* was an oil company. In 1941, the oil company made an offer to Long Beach to recover oil and gas beneath city-owned tidelands over a 35-year period. Title to these tidelands had been granted to Long Beach by the state. The oil company's offer was in the form of a detailed agreement calling for Long Beach to engage the oil company as an independent contractor. Upon receiving the offer, the Long Beach City Council adopted a resolution authorizing the employment of geological and petroleum engineering consultants to examine the proposal. At the request of Long Beach, the oil company paid the cost of these consultants. After the consultants reported favorably on the proposal, the Long Beach City Council authorized negotiations. The city attorney and city manager then agreed on a draft contract, which was presented to the Long Beach City Council in 1942.

The draft contract was "verbally identical" to the offer originally presented by the oil company, but had each paragraph typed on a separate page "to facilitate revision" and "many of the pages were left partially blank." (*Dynamic Ind. Co.* v. *City of Long Beach, supra,* 159 Cal.App.2d at p. 296.) "The draft was read at a regular meeting of the Long Beach City Council . . . and approved, paragraph by paragraph, as so read." (*Ibid.*) The city council then adopted a resolution " 'that the City of Long Beach accept said proposal and the City Attorney be, and he is hereby authorized and directed to prepare a proper form of contract [presumably consolidating the paragraphs and deleting the blank spaces] conforming to the plan and methods proposed by Dynamic Industries Company for the development of said submerged lands. The City Attorney is further authorized and directed to prepare said contract and submit the same to the City Council as soon as possible after this adoption date of this resolution.' " (*Ibid.*)

At approximately the same time, the Long Beach City Council directed the city attorney "to settle the exact boundaries of the lands to be developed under the contract." (*Dynamic Ind. Co.* v. *City of Long Beach, supra,* 159 Cal.App.2d at p. 297.) The city attorney was unable to accomplish this task, because the issue was entangled in a dispute between the United States and the State of California. In 1945, the United States sued California in the United States Supreme Court regarding title to all tidelands along California's coast. This suit indirectly called into question Long Beach's title to the tidelands in question, since Long Beach had received its title by grant from the state. The United States's lawsuit "was determined in favor of the United

States in 1947." (*Ibid.*) In 1950, Congress passed the Submerged Lands Act, by which the United States relinquished to the states the ownership of their respective tidelands and submerged lands. The act was upheld by the Supreme Court against constitutional attack in 1954.

As a consequence of these events, Long Beach was not in a position to proceed with the contract with the oil company until 1954. Long Beach then declined to enter into the contract. The oil company sued, and alleged substantial expenditures relating to the alleged contract. A demurrer by Long Beach was sustained without leave to amend, and the oil company appealed.

The oil company contended that the resolution adopted by the Long Beach City Council in 1942, approving the proposed contract verbatim, and directing the city attorney to prepare the contract document in proper form and submit it to the city council as soon as possible, created a binding agreement. Long Beach countered that Long Beach was a chartered city, and that its charter provided that the city was bound by a contract only if it was signed by the city manager. The proposed contract had never been signed by the city manager as required by the charter.

The Court of Appeal ruled for Long Beach, stating: "The contract whose validity [the oil company] seeks to establish was not signed by the city manager, as the charter requires. It could not have been signed since the area to be included was never defined nor approved by the city attorney or the council. It is well settled that when a municipal charter contains an express limitation upon the mode in which the city may contract, the city is bound only by contracts executed in accordance with the charter provisions; in other words, where the statute provides the only mode by which the power to contract shall be exercised, the mode is the measure of the power." (*Dynamic Ind. Co.* v. *City of Long Beach, supra* 159 Cal.App.2d at pp. 298-299.)

The court continued that "[t]he fact that [the oil company] expended a substantial sum in reliance upon the 1942 resolution is immaterial in view of the charter limitation." (*Dynamic Ind. Co.* v. *City of Long Beach, supra*, 159 Cal.App.2d at p. 299.) The court found support in a quote from *Zottman* v. *San Francisco* (1862) 20 Cal. 96, which itself had quoted a New York decision: " 'It may sometimes seem a hardship upon a contractor that all compensation for work done, etc., should be denied him; but it should be remembered that he, no less than the officers of the [municipal] corporation, when he deals in a matter expressly provided for in the charter, is bound to see to it that the charter is complied with. If he neglect this, or choose to take the hazard, he is a mere volunteer, and suffers only what he ought to have anticipated.' " (*Dynamic Ind. Co.* v. *City of Long Beach, supra*, 159 Cal.App.2d at pp. 299-300.)

In *Dynamic Ind. Co.*, the Long Beach City Council had approved the precise, verbatim wording of the proposed contract. Nevertheless, in the absence of the city manager's signature as required by the city's charter, no contract was formed even though the city council had approved the precise contract language. In the instant case, by contrast, the Los Angeles City Council never approved the wording of the contract documents. The city council approved only the "scope and direction" of the negotiations as described in the CAO Report. When presented with actual contract language, the city council rejected the proposed contract. Similar to the lack of the city manager's signature in *Dynamic Ind. Co.*, here the signature of the mayor was lacking. The signature of the acting mayor on a letter approving the "scope and direction" of the *negotiations* as described in the CAO Report is not the equivalent of the signature of the mayor on a document containing the actual language of the contract. In *Dynamic Ind. Co.*, the city's title to the tidelands was unclear. In the instant case, numerous contractual terms remained undecided. *Dynamic Ind. Co.* clearly shows that no contract was formed in the instant case. (See also *Stratton* v. *City of Long Beach* (1961) 188 Cal.App.2d 761, 772-773 [11 Cal.Rptr. 8] [following *Dynamic Ind. Co*].)

Other cases are similar. In *Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348, 353 [291 P. 839, 71 A.L.R. 161], the court stated: "Certain general principles have become well established with respect to municipal contracts . . . It is . . . settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable." (See also *Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 88 [124 P.2d 34, 140 A.L.R. 570] [quoting from *Los Angeles Dredging*]; *South Bay Senior Housing Corp.* v. *City of Hawthorne, supra*, 56 Cal.App.4th 1231, 1236 [general law city must comply with state statute specifying requirements for entering into contract; cases involving chartered cities apply the law the same way]); *Los Angeles Equestrian Center, Inc.* v. *City of Los Angeles* (1993) 17 Cal.App.4th 432, 449 [21 Cal.Rptr.2d 313] [claim of implied contract not satisfying charter requirements not enforceable]); *Williams Bros. & Haas* v. *City & Co., S. F.* (1942) 53 Cal.App.2d 415 [128 P.2d 56] [contract unenforceable for failure to comply with charter provisions]); cf. *Reams* v. *Cooley* (1915) 171 Cal. 150, 154 [152 P. 293] [where statute prescribes method for school district to enter contract, a contract made otherwise is not binding and doctrine of implied liability has no application].)

g. *The City cannot be estopped to deny the existence of a contract.*

■ Plaintiff and the two amici curiae alternatively contend that even if the requirements of the charter for contract formation have not been satisfied, the City can be estopped to deny the formation of a contract. The cases

consistently reject this proposition. (See, e.g., *Los Angeles Dredging Co. v. Long Beach, supra,* 210 Cal. 348, 353-354 [municipality cannot be estopped to deny validity of contract made in disregard of prescribed mode; such a contract is void unless an emergency exception applies]; *Miller v. McKinnon, supra,* 20 Cal.2d 83, 88 [quoting *Los Angeles Dredging*]; *Los Angeles Equestrian Center, Inc. v. City of Los Angeles, supra,* 17 Cal.App.4th 432, 445, 448-449 [City of Los Angeles cannot be bound by estoppel to a contract not formed in compliance with Section 385]; *San Francisco Internat. Yachting etc. Group v. City and County of San Francisco* (1992) 9 Cal.App.4th 672, 683 [12 Cal.Rptr.2d 25] [claim of "bad faith" by city insufficient to bar City's claim of invalidity of contract when no charter compliance; parties cannot waive charter requirements; when charter expressly states manner for execution of contract, city is bound only by contracts executed in accordance with charter provisions]); *Lundeen Coatings Corp. v. Department of Water & Power* (1991) 232 Cal.App.3d 816, 831 [283 Cal.Rptr. 551] [requirements of Section 385 cannot be avoided on estoppel theory]; *Dynamic Ind. Co. v. City of Long Beach, supra,* 159 Cal.App.2d 294, 299 ["When the charter provision has not been complied with, the city may not be held liable in quasi contract, and it will not be estopped to deny the validity of the contract."]; *Stratton v. City of Long Beach, supra,* 188 Cal.App.2d 761, 773 [quoting *Dynamic Ind. Co.*]; cf. *Reams v. Cooley, supra,* 171 Cal. 150 [where statute specifies manner in which school district may contract, and that manner is not followed, no implied liability]; *State of California v. Haslett Co.* (1975) 45 Cal.App.3d 252 [119 Cal.Rptr. 78] [claim of oral promise may not be enforced against state on estoppel theory]; *Seymour v. State of California* (1984) 156 Cal.App.3d 200 [201 Cal.Rptr. 15] [same].) Additionally, as was made clear in *Dynamic Ind.* and *Zottman,* the fact that plaintiff expended funds in the course of its dealings with the City is "immaterial," and cannot support an estoppel. (*Dynamic Ind. Co. v. City of Long Beach, supra,* 159 Cal.App.2d 294, 299; *Zottman v. San Francisco, supra,* 20 Cal. 96, 104-105.)

Because the cases cited above are all closely on point and all adverse to plaintiff's position, plaintiff attempts to wring an estoppel argument out of *Lentz v. McMahon* (1989) 49 Cal.3d 393 [261 Cal.Rptr. 310, 777 P.2d 83] and *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423]. *Lentz* held that a welfare recipient, defending herself in an administrative proceeding seeking reimbursement of excess payments by a county welfare agency, can assert estoppel because she relied on agency error or misrepresentation. *City of Long Beach* held that a city's actions can estop it from asserting a claim of title to real estate adverse to purchasers who bought in reliance on city action. In *Lentz,* the court stated: "We have long held . . . that estoppel may be asserted against the government 'where justice and right require it' [citation], and we have applied the doctrine

against government entities in a variety of contexts. At the same time, our cases recognize the correlative principle that estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public.' " (*Lentz, supra,* at p. 399, fn. omitted). *City of Long Beach* contains an almost verbatim passage. (*City of Long Beach, supra,* at p. 493). The "correlative principle" noted in both *Lentz, supra,* at p. 399, and *City of Long Beach, supra,* at p. 493, (estoppel cannot be invoked to nullify a "strong rule of policy"), and the wealth of case law requiring compliance with the terms of a charter in order to form a contract, eliminate *Lentz* and *City of Long Beach* as possible authority for the proposition that the contract formation requirements of the city charter may be avoided by estoppel. In an analogous vein, the Supreme Court has recently stated that "it is well settled that a charter city may not act in conflict with its charter . . . [and] [a]ny act that is violative of or not in compliance with the charter is void." (*Domar Electric, Inc.* v. *City of Los Angeles, supra,* 9 Cal.4th at p. 171). No case has ever held that a city may be bound to a contract by estoppel. Although *Lentz* and *City of Long Beach* do establish that estoppel can be invoked against a city in certain circumstances, they do not displace the great weight of authority that estoppel cannot create contractual duties where compliance with the charter is lacking.

Amicus curiae AGC, arguing for an estoppel, states: "Charter provisions such as the one set forth in Section 385 spell out the procedure by which a contract may be entered into by the City in order to ensure that expensive decisions are not hastily made. Section 385 creates a broad base of authority by requiring approval by a number of different individuals. No single individual has absolute authority to bind the municipality; many parts of the city government must work together. [¶] Thus, Section 385 promotes a 'checks and balances' system, the key to which is ensuring that many different individuals are privy to and approve of a contract the City enters." After so cogently stating the apparent purpose of Section 385, AGC nevertheless argues that the City can be bound to a contract by estoppel on the theory that the "checks and balances" system created by Section 385 "to ensure that expensive decisions are not hastily made" were satisfied by the CAO Report. The CAO Report itself refutes this contention. The CAO Report calls for approval of final contract details by the city council and the mayor. A judge's opinion that the abstract purpose of Section 385 was satisfied is not a substitute for the review and approval responsibilities vested by Section 385 in the City's elected political officials.

Even if the law did allow a judge's opinion to substitute for the express requirements of a city charter, there could be no estoppel on the record here. Here the city council and mayor were expressly advised that they would

have the opportunity to review and approve or reject final contract documents. Those final contract documents would have to provide for details such as the price escalation index applicable to the office building, who would pay for offsite improvements, office building specifications left open in the CAO Report, the final content of the low-income-housing component, the amount of office space to be built, the details of the hotel agreement, and many other details. Neither the mayor nor the city council ever approved final contract documents covering these and many other details under discussion. When proposed documents were presented to the mayor and city council, they exercised their expressly reserved power to review and reject them. Even though the parties may at one time have been proceeding in an atmosphere of goodwill and even camaraderie, and may have held high and even reasonable hopes for eventual formation of a final contract, the record shows that no contract had yet been concluded and that final contract formation depended on discretionary approval by the mayor and city council. Thus even if a declaration of estoppel were legally permissible, and even if a court were to conclude that plaintiff was shabbily treated, there is no basis for an estoppel in the record.

h. *The effect of this legal regime is a matter for management by political authorities, not by the courts.*

Plaintiff and amici curiae allege that trust in government is currently low, and that to allow the City to "escape liability" based on the "hypertechnicalities" of charter provisions would discourage private parties from negotiating for contracts with the City, thus reducing competition for city contracts, driving up the City's costs, and harming the City's interests. This might conceivably happen. However, these are not new considerations. For example, *Zottman* v. *San Francisco, supra*, 20 Cal. 96, was an 1862 case concerning events which had occurred in 1854. San Francisco had entered into a contract for construction of an iron fence with a wooden base surrounding a city square. After the contract was formed in accordance with the city charter, certain councilmembers, the city attorney, and other highly placed city officials decided that the fence ought to have a stone rather than a wooden base, and that the iron fence ought to be painted. They instructed the contractor to install a stone base and to paint the fence, and assured him that the city would pay for the extra work. The contractor did the work, but later was not paid. He sued.

The trial court granted a nonsuit on the grounds that the city charter required that contracts for city improvements be made by ordinance enacted by the common council. The testimony showed that "all the members of the Common Council must have been aware of the order to the contractors, as

the work was in full view from the windows of Council chambers, and was the subject of general conversation and approval by the members at their various sessions and elsewhere, and no opposition to it was ever expressed by any member." (*Zottman* v. *San Francisco, supra,* 20 Cal. 96, 99.) The Supreme Court nevertheless affirmed, stating: "The rule is general and applies to the corporate authorities of all municipal bodies; where the mode in which their power on any given subject can be exercised is prescribed by their charter, the mode must be followed." (*Id.* at p. 102.) Since the contract for the extra work had not been formed in accordance with the requirements of the city charter, the Supreme Court ruled that there was no enforceable contract and that the contractor had no right to payment for the extra work.

As authority for the general proposition that a fictitious legal entity (such as a city), which has its powers specified in its creating document (such as a city charter), cannot be bound other than as specified in that document, the *Zottman* court cited an 1804 United States Supreme Court ruling. In the 1804 case, Chief Justice Marshall ruled that an unauthorized employee of a corporation could not bind the corporation to a contract except in the manner specified in the corporation's enabling act. (*Head & Amory* v. *The Providence Insurance Company* (1804) 6 U.S. 127 [2 L.Ed. 229].)[11] Thus the proposition that a contract with a city is not binding unless formed in accordance with the city charter has been in place in California at least since the time of the Civil War, and is based on analogous authority traceable back to Chief Justice Marshall.

Perhaps it is true, as plaintiff and amici curiae argue, that this long-standing state of law could dampen the willingness of private parties to deal with the City on major projects, but that is a matter for management by the City's political authorities. Judges may not properly intrude here on no sounder footing than the varying opinions of different judges about what ought to be done. Methods are available to change this situation by amending the city charter should it be concluded that operating according to the charter is harmful to the City's best interests. The instant case seems largely the product of size and complexity coupled with the modern phenomenon of "public-private partnerships." Given the current terms of the charter, it may be that "public-private" projects of this magnitude can only be safely undertaken by a sequence of contracts, with each successive contract protecting a party in plaintiff's position, or by a contract containing conditions subsequent or dispute resolution methods by which undecided issues will later be decided. These approaches might be cumbersome, but the alternative

---

[11]*Head & Amory* did not involve issues of estoppel or ostensible authority, and the law of corporations was somewhat different at the time. The Supreme Court, however, cited this 1804 case as authority for the analogous proposition involved in *Zottman.*

is the course followed here: extensive expenditure before contract resulting in exposure to significant loss in the event of ultimate failure of the contract negotiations.

III. DISCUSSION AS TO THE CITY'S APPEAL.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. DISPOSITION.

The judgment and order appealed from are affirmed. Each side to bear its own costs on appeal.

Boren, P. J., and Nott, J., concurred.

A petition for a rehearing was denied August 13, 1998, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied September 30, 1998.

*See footnote, *ante*, page 650.