Filed 8/2/23  Buckman v. City of Los Angeles CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| SHIRIN BUCKMAN, | B305192 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC697003) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge.  Affirmed in part; reversed in part and remanded.

Law Offices of Brian M. Brown, Brian M. Brown and Rachel Goldstein for Plaintiff and Appellant.

Michael N. Feuer, Hydee Feldstein Soto, City Attorneys, Kathleen A. Kenealy, Denise C. Mills, Chief Deputy City Attorneys, Scott Marcus, Chief Assistant City Attorney, Blithe S. Bock, Assistant City Attorney, and Michael M. Walsh, Deputy City Attorney, for Defendant and Appellant.

The City of Los Angeles (city) appeals from a judgment entered following a court trial of this employment action brought against the city by former city employee Shirin Buckman. Buckman's operative first amended complaint (FAC) alleged seven claims against the city following her termination: (1) retaliation for taking Family Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 et seq.) leave in violation of the California Family Rights Act (CFRA) (Gov. Code, § 12945.2), (2) disability discrimination, (3) perceived disability discrimination, (4) failure to prevent discrimination, (5) intentional infliction of emotional distress (IIED), (6) failure to pay wages in violation of Labor Code section 221, and (7) illegal collection back of employee's wages in violation of Labor Code sections 221 and 225.5. The trial court found Buckman prevailed on four of the seven causes of action: retaliation for taking FMLA leave, IIED, and the two causes of action based on Labor Code violations. In addition to damages and penalties, the trial court awarded Buckman attorney fees under Government Code section 12965 (part of the California Fair Employment and Housing Act, Gov. Code, § 12900 et seq. (FEHA)).

The city argues the evidence does not support the judgment in favor of Buckman on the retaliation claim, and she cannot recover on the claim because her termination was inevitable. The city further argues the judgment in favor of Buckman on the IIED and the failure to pay wages claims were improper as a matter of law.[1]  Finally, the city argues the trial court erred in

---

[1]     The city makes no argument concerning the judgment as to Buckman's seventh cause of action for illegal collection back of employee wages, therefore we do not directly address this claim.

2

failing to apportion the attorney fees to limit fees to those related to the retaliation claim.

Buckman cross-appeals, arguing the trial court erred in deducting from the attorney fee award 203 hours of counsel's travel time and declining to award a fee multiplier pursuant to *Ketchum v. Moses* (2001) 24 Cal.4th 1122 (*Ketchum*).

We affirm the trial court's judgment as to retaliation. However, we reverse the judgment as to the IIED claim, as Buckman failed to identify sufficiently extreme or outrageous conduct as a matter of law. We also reverse the judgment as to Buckman's claim for unpaid wages, as we find that Buckman's oral agreement with personnel staff for additional sick and vacation time was unauthorized and unenforceable as a matter of law. We reverse the attorney fees award and direct the trial court to reconsider the award of attorney fees on remand.

## BACKGROUND

### Buckman's hiring in 2015

Buckman was first employed by the city from 2005 through 2012 in various capacities, including as a field representative for City Councilmember Jack Weiss, and as a policy analyst with the city's Human Relations Commission under Patricia Villasenor. She voluntarily left her employment with the city in 2012 to attend Whittier Law School.

After graduating from Whittier Law School, Buckman learned from Villasenor about a job opening at the city's Housing and Community Investment Department (HCID) for the Commission on the Status of Women (CSW). There was a conflict in evidence regarding the title of the position. While the position was advertised as an opening for a "Project Coordinator,"

3

Buckman testified she was under the impression that she was applying for an executive director position. While she understood the "classification" for the position was "project coordinator," she believed that the position title was different from the classification. She heard various individuals refer to the position as that of executive director. Buckman's predecessor used the title "Executive Director." However, following a reorganization of staff, HCID Executive Director Laura Guglielmo decided any new person hired to this position would use the title "Project Coordinator" to avoid confusion with Villasenor's "Executive Director" title and to more accurately describe the position.

Buckman was hired for the position on November 17, 2015, and began her employment on January 4, 2016. She reported to Villasenor.[2] Buckman understood this was an exempt at-will position and not a civil service job. Buckman was fired from this position on March 9, 2017.

The CSW was established in 1975 as a commission dedicated to promoting gender equality in Los Angeles. During Buckman's 2016-2017 employment at CSW, the commission was staffed by seven appointed commissioners, including Erma Bernard-Gibson, Pamela Bakewell and CSW President Jessica Postigo. Among Buckman's duties at CSW were overseeing administrative functions and providing status reports; facilitating and implementing the commissioners' programs and policy priorities; interacting with the public; raising awareness about the CSW, including event planning and outreach; and

---

[2] Villasenor's full title was Executive Director for Commissions and Community Engagement Unit. Villasenor did not testify at trial, but portions of her deposition testimony were read into the record.

4

creating, implementing, and running the Transgender Advisory Council (TAC), a program within the city's Human Relations Commission.

**The oral agreement regarding sick leave and vacation pay**

Marcia Ruiz, a personnel records supervisor, communicated the job offer to Buckman, who sought to negotiate a higher salary. However, the salary offered was determined by Buckman's previous city salary.

Buckman claimed she negotiated with Ruiz to use the anniversary dates of her previous employment with the city to calculate her accrued vacation and sick time. Ruiz denied having made such an offer, confirming she lacked the authority to negotiate salary or accrued time. The city took the position that because Buckman's gap between city employments exceeded six months, she accrued vacation and sick time the same as a new hire. Buckman acknowledged this condition of employment during her orientation. However, Villasenor claims Buckman informed Villasenor of the special oral agreement with Ruiz regarding sick leave and vacation time shortly after Buckman was hired.

The city's internal payroll documents, known as PaySR forms, reflected Buckman's earlier anniversary dates were used to calculate her sick leave and vacation time upon the commencement of Buckman's January 2016 employment. Personnel director Alfonso Perez, the individual authorized to approve these forms, signed off on the forms. Also Buckman produced an October 20, 2016 letter she sent to HCID personnel in response to HCID's notification she had received an inaccurate overcalculation of sick and vacation time. In the letter, Buckman stated that in accepting the position of employment, she had

"reasonably relied" on the oral agreement with the personnel department regarding sick and vacation time in lieu of the increase in pay she had sought.

The city disputed the existence of an oral agreement. Ruiz denied having offered Buckman extra sick and vacation time and stated she had no authority to make such an offer. While the city acknowledged the PaySR form automatically populated with an individual's dates from previous employment, the city argued this was a flaw in the system that has since been corrected. The city argued Perez's approval of the forms with the previous dates was an oversight. Perez and Ruiz each testified they failed to notice that Buckman's PaySR contained her old employment dates and confirmed those dates should have been updated.

**The city's concerns about Buckman**

Soon after Buckman commenced her January 2016 employment, she began violating various policies of the city and HCID. Abigail Marquez, HCID's assistant general manager, and Julie O'Leary, the chief management analyst and division chief for HCID, had several communications with Buckman and Villasenor regarding these violations. Guglielmo was concerned that Villasenor's unit lacked appropriate supervision.

Buckman regularly violated the city's parking policy to secure parking for herself. In addition, although Buckman was informed her title was "Project Coordinator," Buckman continuously used the title "Executive Director" in documents and correspondence despite being instructed to stop. Buckman and Villasenor also improperly entered Buckman's work hours using a "Flextime" system that did not work within the city because the city was required under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) and the collective bargaining

6

agreement to pay overtime for after-hours work. Under the "Flextime" system, if Buckman worked more than eight hours in one day, she worked less than eight hours in another day. Buckman was informed, however, that the city was obligated to pay overtime for after-hours work, and any such work had to be approved in advance in writing.

Buckman lobbied for a city cell phone in order to be available and conduct work after hours. Buckman's request was denied, as her position was not intended for after-hours work.

In March 2016, a meeting was requested by Guglielmo and held regarding concerns about Buckman. The meeting was attended by Marquez, O'Leary, Villasenor and Buckman. The meeting's goal was to ensure Buckman complied with HCID policy and thus avoid termination. The primary issues addressed were Buckman's title and overtime.

Guglielmo found Buckman's attitude and behavior at the March 2016 meeting to be defiant and hostile. O'Leary also noted Buckman had a "snotty[,] saccharin attitude." Marquez observed Buckman's unpleasant demeanor and eye-rolling and reported this behavior got worse in the weeks and months following the meeting.

At the March 2016 meeting, Buckman confirmed her title was Project Coordinator and she would only be available during business hours. Guglielmo e-mailed Buckman the necessary forms for requesting overtime or participation in events and suggested submitting such requests a week in advance. Buckman, however, continued violating the city and HCID policies. She continued to use the title "Executive Director" on official documents, continued to request and take unapproved overtime, resulting in a dispute over whether Buckman would be

paid for the unapproved overtime.  Buckman also continued to violate the parking policy.

O'Leary suggested to Marquez that Buckman be terminated.  Marquez contacted the chief of staff at the mayor's office to discuss their concerns.

After the March 2016 meeting, HCID management continued to receive complaints about Buckman's lack of support for the CSW.  Marquez reported Buckman had a consistently dismissive and disrespectful attitude at CSW meetings.  Guglielmo observed Buckman's hostile and aggressive attitude at a large HCID staff meeting.  In the summer of 2016, CSW President Postigo recalled Buckman telling the commission the HCID was evil and making her life a living hell.  She complained about both O'Leary and Marquez.  Postigo frequently reported her frustrations about Buckman to Marquez, O'Leary, Guglielmo, Villasenor, and HCID General Manager Cervantes, including that Buckman was spending too much time creating and supporting the TAC to adequately support the CSW.  O'Leary also received complaints of Buckman being on her cell phone during CSW's monthly meetings.  Postigo complained that a reception for Saudi Arabian officials failed due to Buckman's neglect, and the CSW's efforts to work with the Los Angeles Police Department (LAPD) on human trafficking issues failed because Buckman was so antagonistic the assigned LAPD detective refused to work with Buckman.  Commissioner Bakewell testified that while she was initially satisfied with Buckman, she knew other commissioners were not happy with her performance.  Buckman complained to the CSW she felt confined.  She was unhappy about not getting a cell phone or her desired title and with her inability to attend after-hours events in

8

overtime.  Bakewell also noted that Buckman was unprofessional through body language such as smirks, eye-rolling, and huffing and puffing.  Bakewell noted, however, when Buckman was available for CSW work, she generally was credited with doing good work.

By about June 2016 Marquez agreed Buckman should be terminated.  Marquez noted the negative feedback from CSW as well as her personal observations of Buckman and the repeated policy violations.  Guglielmo recalled that she agreed Buckman should be terminated by late summer 2016.  HCID personnel director Perez estimated he and Guglielmo discussed Buckman's potential termination 15 to 20 times in 2016.  Perez monitored the discussions to make sure the decision was consistent with policy.  Guglielmo cited Buckman's poor administration of multiple commissions.  In light of Buckman's close working relationship with Villasenor, Guglielmo decided Buckman and Villasenor should be fired at the same time.  As a result, Villasenor was not notified of the decision to fire Buckman.  HCID General Manager Cervantes agreed that Villasenor and Buckman should be terminated.

O'Leary began preparing a formal recommendation memorandum to terminate Villasenor.  While she initially started preparing a similar memorandum regarding Buckman, it was later decided to be unnecessary because Buckman did not have a long tenure with the city like Villasenor.

**Villasenor's positive evaluation of Buckman**

In mid-April 2016 Villasenor wrote a positive evaluation of Buckman.  The city argues the evaluation was not properly prepared, received or reviewed.

The April 2016 evaluation gave Buckman an overall rating of "[o]utstanding." Villasenor rated Buckman's performance as "outstanding" on seven of the eight factors listed. On one factor, "Personal Relations," Villasenor rated Buckman as "Exceeds Standard." (Boldface and some capitalization omitted.)

**The city's removal of Buckman's prior sick leave and vacation pay**

O'Leary noticed Buckman had excessive accrued benefits and contacted the human resources and payroll departments. In October 2016, Ruiz confirmed the failure to update Buckman's PaySR resulted in excessive unearned vacation and sick hours. Perez admitted to previously missing this error, but noted to leave it would violate policy. Therefore, Perez instructed Ruiz to inform Buckman and to correct Buckman's PaySR to reflect hours actually earned. Correcting Buckman's anniversary dates eliminated 105.33 hours of vacation time and 15.5 hours of sick time. Buckman had already used some of the unearned vacation and sick hours, in an amount equivalent to $2,878.89, which the city considered an overpayment.

In an October 19, 2016 phone call from Ruiz, Buckman was informed of an error in the calculation of her sick leave and vacation benefits and that the extra benefits would be removed. Later that day, Ruiz e-mailed Buckman that her vacation and sick leave anniversary dates had been "inaccurately overstated" and her leave balances would be adjusted. Ruiz noted the error had resulted in an overpayment and Ruiz offered to discuss available options.

On October 20, 2016, Buckman sent Ruiz an e-mail and a letter arguing she was entitled to the disputed sick leave and vacation pay. The communications included copies of her PaySR

10

form and paystubs showing the accrual amounts. The letter outlined her claimed prior conversations with "HCID Personnel," including Ruiz, promising that Buckman's sick and vacation anniversary dates would be restored to the date of her previous employment with the city, and her reliance on this information in accepting employment with the city. Buckman declined the city's request to repay the purported overpayments and requested that her sick and vacation pay amounts be restored.

Ruiz denied promising Buckman any special arrangement regarding her vacation and sick hours. Ruiz testified she had never done such a thing with any prospective employee and had no authority to do so.

On November 8, 2016, Buckman received an e-mail from HCID personnel supervisor Nanet Rondina claiming an overpayment of $2,878.89 had been made. The e-mail attached various forms outlining Buckman's options for repayment of this amount, including an employee payroll deduction consent form. Buckman declined to sign the form.

**Buckman's grievance and appeal**

Following the city's actions regarding her leave time, Buckman filed a grievance against the city through her union representative, Marleen Fonesca. The grievance was heard on November 17, 2016, by HCID personnel staff member Arlene Johnson. Buckman's initial grievance was denied.

Buckman appealed HCID's ruling. The appeal was heard on January 4, 2017, by Guglielmo, who did not have authority to grant Buckman the additional vacation and sick time she was seeking, because it would be "outside of the City's policies." Buckman testified Guglielmo said she thought Buckman was lying about the "promise" Ruiz allegedly made to Buckman

11

regarding her leave time during the employment negotiations. Buckman informed Guglielmo the hearing was making her ill, saying she could not eat or sleep and was "bleeding from the backside." Unbeknownst to Buckman, Guglielmo remarked to HCID Senior Personnel Analyst I Stephen Cross, "'Well, she'll file for FMLA now,' something to that effect." Guglielmo also suggested Buckman's statements about bleeding during the hearing were suspicious and suggested Buckman may file a "trumped-up" FMLA filing. Cross testified Guglielmo then directed him to prepare the necessary forms in case Buckman did file for FMLA leave.

The appeal was never decided due to Buckman's termination.

**Buckman's treatment and FMLA leave**

Buckman began treating with psychologist Melissa Bagwell in November 2016 as a result of ongoing stress due to the circumstances at HCID and studying for the bar exam. Her symptoms included bleeding, vomiting, diarrhea, not eating, not sleeping, chest pains, dizziness, nightmares, anxiety, and panic attacks. After five visits, Dr. Bagwell requested Buckman be placed on FMLA leave from January 10, 2017, through February 28, 2017. Dr. Bagwell's request was based on both work and personal stressors. The city approved the FMLA leave on January 10, 2017. During her FMLA leave Buckman took the state bar exam.[3]

---

[3] Villasenor was also on leave around the same time as Buckman.

Perez stated the city does not terminate anyone on medical leave. Thus, Buckman's FMLA leave put the city's plans to terminate Buckman and Villasenor on hold.

Marquez advised the CSW commissioners that Buckman was on leave and Deborah Wood was assigned to take over her duties.

Commissioner Postigo was frustrated that Buckman left on leave without notice and without providing access to the existing documents related to an upcoming event. Wood remedied the situation, and Marquez reported things ran smoothly when Villasenor and Buckman were on leave.

Villasenor returned from leave in February 2017. Buckman returned from FMLA leave on March 1, 2017. On the day Buckman returned from leave, Marquez, O'Leary and Perez met about the timing of terminating Buckman and Villasenor now they both were at work. O'Leary's notes reflected that CSW commissioner feedback was a primary basis for the termination. Marquez delivered the formal written recommendation for termination to Cervantes, Guglielmo, and Perez on March 8, 2017.

On March 9, 2017, Marquez and Cross informed Buckman of her termination. Consistent with city policy for at-will employees, Marquez did not elaborate on the reasons for the termination. Buckman testified during the meeting, she was informed that there was going to be a reorganization in the department, and that her workload was going to be redistributed. In the memorandum terminating her employment, the only reason given was Buckman's status as an at-will employee.

Villasenor was terminated at the same time at a meeting with O'Leary and Perez. Buckman and Villasenor met in the

lobby on their way out. Villasenor informed Buckman that she had also just been terminated.

Buckman testified she was shocked and upset by the termination and claimed emotional distress from being terminated.

## PROCEDURAL HISTORY

**The pleadings**

Buckman filed her initial complaint for damages against the city on March 6, 2018. She initially asserted eight causes of action: (1) retaliation for exercising CFRA leave in violation of FEHA, Government Code section 12940; (2) discriminatory termination in violation of the CFRA, Government Code section 12945.2; (3) disability discrimination in violation of FEHA; (4) discrimination based on perceived disability in violation of FEHA; (5) failure to take reasonable steps to prevent discrimination; (6) IIED; (7) failure to pay wages in violation of Labor Code sections 202, 203, 210, 221 and 227.3; and (8) illegal collection back of employee's wages in violation of Labor Code section 221.

On May 4, 2018, the city filed a demurrer asserting the complaint failed to state a cause of action on various grounds. Among other things, the city argued that Buckman failed to state a cause of action for IIED because such a cause of action was not available against public entities and the claim was barred due to workers' compensation exclusivity. The trial court overruled the demurrer as to the IIED claim.

The operative FAC, filed June 7, 2018, alleged seven causes of action: (1) retaliation for taking CFRA medical leave, (2) disability discrimination, (3) perceived disability discrimination,

14

(4) failure to prevent discrimination, (5) IIED, (6) failure to pay wages in violation of Labor Code sections 221 and 227.3, and (7) illegal collection back of employee's wages in violation of Labor Code section 221.

On June 26, 2018, the city filed a general denial and 40 affirmative defenses.

**Trial and judgment**

The bench trial on Buckman's seven causes of action commenced on October 21, 2019, and continued for 15 partial days.

On January 31, 2020, the trial court entered judgment in favor of Buckman and against the city on the following four causes of action: (1) retaliation in violation of the CFRA, (2) IIED, (3) failure to pay wages pursuant to Labor Code sections 221 and 227.3, and (4) illegal collection back of employee's wages pursuant to Labor Code section 221.  Buckman's causes of action for disability discrimination, discrimination based on perceived disability and failure to take reasonable steps to prevent discrimination were decided in favor of the city.

The trial court awarded Buckman (1) past economic damages of $230,085 on her first cause of action for retaliation; (2) general damages of $50,000 for her IIED claim; and (3) loss of accrued sick leave and vacation pay, plus civil penalties and interest, on her sixth and seventh causes of action for Labor Code violations of $8,221.23; for a total sum of $288,306.23.

The court noted Buckman never directly received any criticism of her performance or any negative performance reviews or disciplinary warnings.  Buckman's only performance review was Villasenor's April 2016 review in which she received an overall review of "[o]utstanding."  The court further noted one of

15

the claims the city used to justify Buckman's termination was that three CSW commissioners were extremely critical of Buckman's performance. The court observed the testimony of these commissioners at trial undermined this claim. Further, during discovery and at trial, the city used shifting and contradictory reasons to support its decision to terminate Buckman's employment. For example, in response to Buckman's April 2018 interrogatories, the city claimed Buckman's termination was based on complaints from commissioners about her work, Buckman's misappropriation of parking privileges, and her hostile and inappropriate behavior towards fellow employees. In August 2018, the city provided supplemental responses adding new reasons for Buckman's termination, including inappropriate, sarcastic comments to her superiors; argumentative behavior about her salary placement; use of the title Executive Director; request for a cell phone; continued tardy submission of overtime requests on short notice after the overtime work was performed; improper requests for parking; and requests from Commissioners Postigo, Bakewell and Bernard-Gibson that she be reassigned due to their difficulty working with Buckman. The trial court found testimony from the city's witnesses showed the claimed reasons for Buckman's termination were implausible and pretextual.

In support of its decision in favor of Buckman on her retaliation claims, the trial court found the following facts: Guglielmo was one of those who recommended Buckman's termination; Guglielmo presided over Buckman's grievance appeal regarding the removal of her accrued sick and vacation pay; and Guglielmo commented to Cross after the grievance appeal meeting, "Well she'll file for FMLA now." Further,

16

O'Leary's handwritten notes from the March 1, 2017 meeting establish the decision to terminate Buckman was made on March 1, 2017, the day Buckman returned from her medical leave. The same notes contradicted the myriad reasons given by the city for Buckman's termination and cite only "Commissioners feedback" as the reason. The timing of Buckman's termination, nine days after she returned from FMLA leave, also suggested the termination was retaliatory. The court cited *Bareno v. San Diego Community College Dist.* (2017) 7 Cal.App.5th 546, 571 (*Bareno*), for the proposition that "'[w]hen an adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation."'"

The court found Buckman showed she was harmed by the city's retaliatory conduct based on Buckman's testimony describing her physical and emotional stress from the city's actions.

As to Buckman's cause of action for IIED, the court found the city subjected Buckman to stress for acts including removing the title Executive Director, removing accrued sick leave and vacation pay, being subjected to Guglielmo calling her a liar in front of other HCID staff and Buckman's union representative, and refusing to pay for approximately 20.5 hours of worked overtime. Further, Buckman's testimony showed ongoing physical and emotional symptoms stemming from the city's actions. Based on this, the trial court found Buckman had sustained her burden of proof on each of the elements of a claim for IIED.

As to Buckman's claim for unpaid wages, the court found the city was liable to Buckman for unpaid wages for her accrued sick pay and vacation leave, citing the following evidence: the

17

PaySR form showing using prior anniversary dates of February 5, 2006, and October 1, 2006, for her sick pay and vacation leave; the trial testimony the form was prepared by city employees and approved by Perez; and five separate entries reflecting the prior work anniversary dates. For the pay period ending October 15, 2016, there was a deduction of 105.33 hours of vacation time and 15.50 hours of sick leave from Buckman's pay stub. The court found credible Buckman's testimony that she was orally promised, as a condition of accepting re-employment with the city, her sick and vacation dates would be restored to her prior work anniversary dates in lieu of a higher salary. The court noted Labor Code section 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Further, Labor Code section 227.3 requires all of an employee's vested unused vacation time be paid to that employee upon the termination of the employee's employment. The court cited *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 776,779, and *Johnson v. Contra Costa County Fire Protection Dist.* (1972) 23 Cal.App.3d 868, 873, as authority that vacation pay and sick leave are earned wages that vest upon performance. The court stated there was no dispute that Buckman's accrued vacation time and sick leave were removed from Buckman's paycheck and never repaid, and thus, Buckman met and sustained her burden of proof of her claim for unpaid wages.

Finally, as to Buckman's cause of action for illegal collection back of employee's wages, the trial court cited the same evidence as for her claim for unpaid wages. The court found the evidence showed the city paid Buckman wages in the form of accrued vacation pay and sick leave, and the city unlawfully

18

collected back her accrued vacation and sick leave without obtaining a court order or Buckman's written consent. Thus, the city acted in violation of Labor Code section 221. As a violation of Labor Code section 221 results in civil penalties, the court found Buckman was entitled to such penalties as well as interest on those penalties pursuant to Labor Code section 225.5, subdivision (b).

The city filed its notice of appeal from the judgment on March 23, 2020.

**Attorney fees**

On March 27, 2020, Buckman moved for attorney fees pursuant to Government Code section 12965 and Code of Civil Procedure section 1021.5. Buckman claimed a lodestar amount of $1,065,358.75. Buckman also sought a multiplier of at least 2.0, which increased the fees sought to $2,130,717.50.

The hearing was held on June 25, 2020. The trial court granted the motion in part and denied it in part, finding that Buckman failed to identify any interest beyond pursuing her own personal economic interest, thus an award of fees under Code of Civil Procedure section 1021.5, the private attorney general statute, was inappropriate. The trial court also reduced some of the requested hours and added some for drafting the reply and appearing at the hearing. Ultimately, the trial court awarded $958,808.75.

The notice of ruling on Buckman's fee motion was filed and served on June 29, 2020. On July 14, 2020, the trial court issued its order granting in part and denying in part Buckman's motion for attorney fees. On July 23, 2020, the city appealed the postjudgment attorney fee award. On August 4, 2020, Buckman cross-appealed.

19

On October 1, 2021, this court consolidated the city's appeal from the underlying judgment with the appeal and cross-appeal on the attorney fee order.

**DISCUSSION**

**I.    The city's appeal from the judgment**

    **A.    *Retaliation claim***

The city challenges the trial court judgment in favor of Buckman on her retaliation claim.  The city's appeal on this issue raises two factual questions: whether Buckman's FMLA leave was a substantial motivating reason for her discharge and whether any alleged retaliatory intent actually caused Buckman any injury.

        **1.**  *Standard of review*

As the city's claims are factual, we apply the substantial evidence test.  Under this standard, our review "begins and ends with a determination of whether there is any substantial evidence . . . to support the trial court findings." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)  We accept the evidence most favorable to the judgment and assume that the contrary evidence was not sufficiently credible to be accepted by the trier of fact.  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 595.)  All evidentiary conflicts must be resolved in favor of the prevailing party, so long as the evidence is sufficient to support the judgment.  (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1127.)  Further, we must indulge all reasonable inferences in support of the judgment, even if a contrary determination could likewise be upheld.  (*County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 72-73.)  If substantial

evidence supports the trial court's factual findings, those findings must not be disturbed on appeal.  (*Schmidt, supra*, at p. 582.)

### 2.  *Applicable law*

Buckman brought her claim for retaliation for taking protected medical leave under FEHA (Gov. Code, § 12900 et seq.), which prohibits employers from retaliating against an employee for taking a qualified medical leave under the CFRA or the FMLA.  (Gov. Code, § 12945.2, subd. (k).)  Section 12945.2, subdivision (k) provides that it is unlawful "for an employer to . . . discharge . . . any individual because of the following . . .  [¶]  [a]n individual's exercise of the right to family care and medical leave provided by subdivision (a)."

The elements of a cause of action for retaliation in violation of CFRA are """(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA [leave]; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA [leave]."""  (*Bareno, supra*, 7 Cal.App.5th at p. 560.)

The burden-shifting framework established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805 (*McDonnell Douglas*), is applicable to Buckman's retaliation claim under FEHA.  (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 248.)  Under the *McDonnell Douglas* analysis, the plaintiff is first required to establish a prima facie case of retaliation.  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)  Once the employee establishes the prima facie case, the employer must offer a legitimate, nonretaliatory reason for the adverse employment action.  (*Ibid.*)  If the employer provides

a legitimate, nonretaliatory reason for the adverse action, the presumption of retaliation disappears, and the burden shifts back to the employee to prove intentional retaliation. (*Ibid.*) The employee must then produce evidence that the employer's stated reasons for the adverse action were merely pretextual. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 333-334.)

In order to establish a prima facie case of retaliation under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must show that he or she engaged in a protected activity, suffered an adverse employment action, and that "'a causal link existed between the protected activity and the employer's action.'" (*Bareno, supra*, 7 Cal.App.5th at p. 560.) A "close temporal connection" between a medical leave and an adverse employment action can be "'"strongly suggestive of retaliation."'" (*Id.* at p. 571.)

> **3.** *Substantial evidence supported the trial court's determination that Buckman's taking of leave was a substantial motivating reason for her discharge*

The city does not dispute that Buckman was eligible for and took a protected medical leave. The city challenges the court's factual determination that Buckman's protected act of taking FMLA leave was a substantial motivating factor for her termination. As set forth below, we find that substantial evidence supports the court's determination.

The trial court cited several facts established at trial as support for its decision that the city terminated Buckman's employment in retaliation for taking FMLA leave. The trial court relied heavily on the timing of Buckman's termination, observing the handwritten notes of one of the decisionmakers, O'Leary, "established that the decision to terminate . . . Buckman and her

supervisor . . . was made on March 1, 2017, the very day that [Buckman] returned from her medical leave." While the city provided evidence the decision was made at an earlier time, the trial court was not required to credit that evidence. O'Leary's notes constitute substantial evidence, thus we must accept that evidence and assume that the contrary evidence was not sufficiently credible to be accepted by the trier of fact. (*In re Michael G., supra*, 203 Cal.App.4th at p. 595.) The court was entitled to infer from the timing of Buckman's termination that it was retaliatory. "'When an adverse employment action "follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation."'" (*Bareno, supra*, 7 Cal.App.5th at p. 571.)

In addition to the timing of Buckman's termination, there was evidence of negative reactions to Buckman's decision to take leave. Guglielmo, one of those who recommended Buckman be terminated and who also presided over Buckman's grievance appeal, commented to Cross, "Well she'll file for FMLA now," following the grievance appeal meeting where Buckman stated she was "bleeding out of every orifice." While the city argues nothing about this comment suggests a motive to retaliate, the trial court was entitled to infer this comment reflected a negative perspective on Buckman's anticipated request for leave. In addition to Guglielmo's comment, during Buckman's leave, Commissioner Postigo expressed frustration that Buckman had taken medical leave. Again, the city argues that nothing about this comment suggests a retaliatory motive for Buckman's termination. However, the trial court was entitled to infer that Guglielmo's and Postigo's frustrations at Buckman for taking leave resulted in a retaliatory termination. This is particularly

23

the case where, as here, the termination followed closely after Buckman's leave. The trial court's inferences were reasonable under the circumstances, and we must indulge all reasonable inferences in support of the judgment. (*County of Kern v. Jadwin, supra*, 197 Cal.App.4th at pp. 72-73.)

While the city offered nonretaliatory reasons for Buckman's termination, there was evidence that such reasons were pretextual. Pretext may be inferred from factors such as "'the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.'" (*Moore v. Regents of University of California, supra*, 248 Cal.App.4th 216, 239.)

In addition to the temporal proximity of the city's termination of Buckman to her FMLA leave, the court described contradictions and inconsistencies in the city's evidence related to the timing of, and reasons for, the decision to terminate her. The court found O'Leary's notes from the March 1, 2017 meeting, which cited "Commissioners feedback" as the reason for Buckman's termination, contradicted the various other reasons the city gave for Buckman's termination. In addition, the three commissioners who testified at trial "either failed to support or contradicted the City's contentions regarding the bases for [Buckman's] termination." Prior to taking leave, Buckman never received any criticism for her performance or any negative performance reviews or disciplinary warnings. In her only performance review, Buckman received an overall review of "[o]utstanding." The court was permitted to infer from this evidence that the city's stated reasons for Buckman's termination were pretextual. (*Soria v. Univision Radio Los Angeles, Inc.*

24

(2016) 5 Cal.App.5th 570, 595 [noting that "conflicts and inconsistencies in the evidence supporting an employer's proffered legitimate reason for termination . . . may be probative when considered together with other factors"].)

As to the timing of the decision to terminate Buckman, the court found the city also presented "inconsistent and shifting reasons as to when the actual decision to terminate [Buckman] was made." The city argues the "undisputed" evidence showed the decision to terminate Buckman was made in September 2016. The city argues the court's determination that the decision was made at a March 1, 2017 meeting was "based on a speculative interpretation" of O'Leary's notes of the meeting. The city provides a detailed analysis of its perspective that the court's decision was based on a "mischaracterization" of the evidence.

It is not our place to re-evaluate the evidence or reconsider the credibility of testimony. (*People v. Rodriguez* (2021) 66 Cal.App.5th 749, 766.) O'Leary's March 1, 2017 notes confirm the decision was made to let Buckman go first "based on commissioners' feedback." There is nothing speculative about the trial court's factual finding that this was the first time it was definitively decided that Buckman would be terminated. The trial court noted the previous testimony regarding the decision to fire Buckman was contradictory and inconsistent. The trial court was entitled to rely on O'Leary's written notes and reject all other evidence.

The city argues only Cervantes had authority to make the final decision to terminate Buckman and that Cervantes was not present at the March 1, 2017 meeting. The city notes Cervantes was present during discussions in August and September 2016 when it was decided Buckman's employment should be

terminated. However, Cervantes was rarely mentioned during the trial testimony regarding Buckman's termination. The trial court was entitled to assume the decision was made without Cervantes present, regardless of whether that was proper procedure.

The trial court described "[w]eaknesses, implausibilities, shifting reasons and direct contradictions" regarding the city's claimed reasons for terminating Buckman's employment. (Boldface omitted.) In doing so, the court outlined in detail the city's responses to the first set of form interrogatories versus the supplemental responses, which changed the reasons for Buckman's termination. The court noted the testimony from three commissioners contradicted the city's assertions regarding rampant complaints and performance issues.

The city objects to the trial court's use of its discovery responses in making its decision on the retaliation issue. The city claims the trial court improperly based liability on the good faith efforts of litigation counsel in providing answers in discovery. The city admits its first round of discovery responses were incomplete. They were submitted without prejudice to serving supplemental responses with facts that were subsequently discovered, recalled, or "which, in good faith, were overlooked or omitted." The city asserts the supplemental responses were provided based on the ongoing investigation and the receipt of additional information from witnesses. Buckman never sought to bind the city to its original responses. The city argued its supplemental responses did not contradict its earlier responses, but merely elaborated on further reasons for Buckman's termination. We decline to address in detail the evidence set forth in the city's discovery responses. Even

assuming the trial court improperly relied on the discrepancies between the two responses, there was substantial evidence in the record supporting the trial court's decision that Buckman's termination resulted from retaliation for her decision to take FMLA leave. The city's shifting rationales for her termination may be probative when considered together with other factors. (*Soria v. Univision Radio Los Angeles, Inc., supra*, 5 Cal.App.5th at p. 595.)

Finally, the city cites *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 241 (*Harris*), for the proposition that even when an employee shows discrimination or retaliation was a substantial factor motivating his or her termination, an "employer is entitled to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time." Under these circumstances, "[i]f the employer proves by a preponderance of the evidence that it would have made the same decision for lawful reasons, then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement." (*Ibid.*) The city argues even if there was an improper motive, the evidence showed that Buckman's termination was inevitable.

*Harris* is distinguishable. In *Harris*, the terminated employee, a bus driver, had notable performance-related problems prior to her termination. She had been involved in two preventable accidents while driving her bus, and also had two "miss-outs" on her attendance record, which meant she failed to show up for her assigned shift without giving her supervisor adequate notice. (*Harris, supra*, 56 Cal.4th at p. 212.) After her first three months as a probationary driver, Harris was given an evaluation with an overall rating of "'further development

needed.'" (*Ibid.*)  On the same day Harris provided her supervisor with a doctor's note permitting limited restrictions to her work, Harris's name appeared on a list of probationary drivers who were not meeting standards for continued employment.  (*Id.* at p. 213.)

Here, in contrast, Buckman had no formally noted objective deficiencies or shortcomings at any time.  She had never been informed her performance was anything other than adequate, and her one performance review gave her an overall rating of outstanding.  While the evidence in *Harris* was sufficient to show, by a preponderance of evidence, that the plaintiff would have been terminated regardless of any discriminatory motive, the evidence here was not as strong.  On this record, the trial court was not required to find that Buckman's termination was inevitable regardless of any retaliatory motive.

## B. *IIED*

The city argues the trial court erred as a matter of law in deciding Buckman's IIED claim in her favor.  We agree.  For the reasons set forth below, we reverse the judgment as to this cause of action.

### 1. *Applicable law*

The elements of a cause of action for IIED are "'''"(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."'''"  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050 (*Hughes*).)  "A defendant's conduct is 'outrageous' when it is so ""extreme as to exceed all bounds of that usually tolerated in a

28

civilized society.""'" (*Ibid.*)  In addition, the defendant's conduct must be ""'"intended to inflict injury or engaged in with the realization that injury will result."'"" (*Ibid.*)  "Liability for intentional infliction of emotional distress '"does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."'" (*Ibid.*)

"Whether a defendant's conduct can reasonably be found to be outrageous is a question of law that must initially be determined by the court . . . ." (*Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 534.)  We find that, as a matter of law, the city's conduct was not so extreme as to exceed all bounds of that usually tolerated in a civilized society.  Because Buckman has failed to show outrageous conduct, which is an essential element of her IIED claim, we reverse the trial court's decision in her favor on this cause of action.[4]

Personnel management decisions are generally not "outrageous conduct beyond the bounds of human decency," even when improperly motivated.  (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80 (*Janken*).)  In *Janken*, the plaintiffs alleged their employer engaged in a practice of age discrimination.  (*Id.* at p. 61.)  The *Janken* court determined the plaintiffs' IIED claim failed as a matter of law because

---

[4]     The city raises two challenges to the trial court's decision in favor of Buckman on her IIED cause of action: (1) the Workers' Compensation Act (Lab. Code, § 3200 et seq.) exerts exclusive jurisdiction over employment-based emotional injuries  and (2) the claimed conduct was not outrageous as a matter of law.  Because we agree with the city that the conduct at issue was not outrageous as a matter of law, we decline to address the parties' competing arguments as to the workers' compensation exclusivity issue.

29

"[m]anaging personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society." (*Id.* at p. 80.) When the allegations show personnel management activity, such activity is insufficient to support a claim of IIED, even where the activity showed that the employer "downgraded or altered plaintiffs' performance appraisals; demoted, terminated or laid off plaintiffs; failed to promote or failed to transfer plaintiffs; failed to provide plaintiffs with salaries commensurate with their qualifications, experience and responsibilities; placed a 'cap' on salaries of long-term employees such as plaintiffs; . . . failed to provide plaintiffs with work assignments; failed to provide plaintiffs with sufficient clerical or secretarial support; failed to respond to correspondence sent by plaintiffs . . . ; 'accused' one plaintiff of not properly maintaining a time card; and similar claims." (*Id.* at p. 79.)

### 2. *Analysis*

The acts of which Buckman complains are no more severe than those alleged in *Janken*. Buckman complains of a superior calling her a liar during the grievance hearing, unilaterally removing her vacation and sick pay, and ultimately terminating her employment. These actions are not so extreme as to exceed all bounds of that usually tolerated in a civilized society. (*Hughes, supra*, 46 Cal.4th at p. 1050.) The city's acts of removing her vacation and sick pay and terminating her employment are within the realm of personnel management. The insult also does not rise to the level of outrageous conduct as a matter of law. (*Ibid.*)

*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116 provides additional authority that Buckman's IIED claim is

30

insufficient.  In *Yurick*, a hospital employee asserted causes of action for gender discrimination, unlawful retaliation, IIED, wrongful discharge and age harassment.  (*Id.* at p. 1119.)  Among other claims, the plaintiff claimed the defendant supervisor called her "senile and a liar" in the presence of others.  (*Ibid.*)  In determining that the employee's cause of action for IIED had no merit, the *Yurick* court noted that "'it is generally held that there can be no recovery for mere profanity, obscenity, or abuse, without circumstances of aggravation, or for insults, indignities or threats which are considered to amount to nothing more than mere annoyances.  The plaintiff cannot recover merely because of hurt feelings.'"  (*Id.* at p. 1128.)  The supervisor's conduct was "not so egregiously outside the realm of civilized conduct as to give rise to actionable infliction of mental distress."  (*Id.* at p. 1129.)  Similarly, Guglielmo's act of calling Buckman a liar in front of other people is insufficient to support a claim of IIED.

Finally, in *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, an obese employee complained of the general manager's comments he would likely be unable to find a uniform that fit her.  She felt humiliated when the uniform shirts did not fit her and was accused of being noncooperative when she could not wear the assigned uniform shirt, as it did not come in her size.  (*Id.* at pp. 919-920.)  She was also refused training for positions she wanted and suffered pay disparity with newer employees.  She filed a grievance on the pay issue and was later terminated after being accused of attempting to surreptitiously record a board meeting.  (*Id.* at pp. 920-924.)  Under these circumstances, the *Cornell* court found the trial court properly granted summary judgment on Cornell's claim for IIED.  The supervisor's "comments, which were inappropriate but not severe,

31

[and] his official actions [did not] rise to the level of 'outrageous conduct beyond the bounds of human decency.'" (*Id.* at p. 946.) Insults by a superior at work, and even termination of employment, are indignities that generally must be borne without recourse to legal remedy under an IIED cause of action.

Buckman cites *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, for the proposition that a cause of action for IIED may be stated where the perpetrator stands in a position of authority over the plaintiff and is aware of the plaintiff's particular susceptibility to emotional distress. However, the facts were significantly more extreme than those present in this case. The plaintiff's foreman shouted racial insults at the plaintiff and terminated him abruptly, stating: "'You goddam "n######" are not going to tell me about the rules. I don't want any "n######" working for me. I am getting rid of all the "n######"; go pick up and deliver that 8-ton roller to the other job site and get your pay check; you're fired.'" (*Id.* at pp. 496-497.) Under these circumstances, the *Alcorn* court held that the claim survived demurrer, as the plaintiff had "alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendants' conduct was extreme and outrageous . . . ." (*Id.* at p. 498.) At a minimum, "the aggravated circumstances alleged by plaintiff seem[ed] sufficient to uphold his complaint as against defendants' general demurrer." (*Id.* at p. 499.) The city's actions in this matter are less egregious and shocking and do not rise to the level of those stated in *Alcorn*.

We conclude as a matter of law that the actions of the city alleged in this matter do not rise to the level of "outrageous conduct beyond the bounds of human decency." (*Janken, supra*,

32

46 Cal.App.4th at p. 80.) The decision in Buckman's favor on this issue is reversed.

### C. *Labor Code cause of action for lost wages*

The city challenges the trial court's decision in favor of Buckman on her sixth cause of action for lost wages in violation of Labor Code sections 221 and 227.3.[5]

**1.** *Applicability of Labor Code section 221 to the city*

We sought supplemental briefing from the parties on an issue not discussed in the trial court or the appellate briefs— whether Labor Code section 221 applies to public employers in light of *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2021) 60 Cal.App.5th 327 (*Association for Los Angeles Deputy Sheriffs*), particularly the discussion at pages 338 through 342, and the cases cited therein.[6]

---

[5] As set forth above, the city has made no specific claim on appeal that the seventh cause of action for illegal collection back of wages should be reversed. Thus, we do not separately address the seventh cause of action. However, the sixth and seventh causes of action are intertwined, particularly because the trial court jointly awarded damages, penalties and interest against the city for the "6th and 7th causes of action under Labor Code §§ 221, 225.5 and 227.3." On remand, the trial court is directed to reevaluate its award under the seventh cause of action in light of this opinion.

[6] The *Association for Los Angeles Deputy Sheriffs* decision was published in January 2021, thus was not available to the parties during trial. However, it was published prior to the appellate briefing in this matter. In addition, the *Association for Los Angeles Deputy Sheriffs* decision relied on prior case law suggesting that "'provisions of the Labor Code apply only to employees in the private sector unless they are specifically made

33

In *Association for Los Angeles Deputy Sheriffs,* the Los Angeles Deputy Sheriffs sought a writ of mandate and declaration that a provision of a certain memorandum of understanding was unenforceable on the grounds that it violated Labor Code section 221, among other laws. (*Association for Los Angeles Deputy Sheriffs, supra*, 60 Cal.App.5th at p. 333.) The *Association for Los Angeles Deputy Sheriffs* court found that Labor Code section 221 does not apply to charter counties such as Los Angeles County. (*Association for Los Angeles Deputy Sheriffs*, at pp. 338-341.) The city has argued in its supplemental briefing that there is no reason to treat the city—which is a charter city—any differently, as the same constitutional and statutory provisions that apply to counties also apply to charter cities. (*First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 661 [Los Angeles "is a chartered city with maximum allowable control over municipal affairs."]; see Cal. Const., art. XI, § 5, subd. (b) [charter cities have plenary power

---

applicable to public employees."' (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 330.) As the city points out, the *Association for Los Angeles Deputy Sheriffs* decision and related cases call into question whether any of the Labor Code provisions at issue in this matter apply to public entities such as the city. (See *Allen v. San Diego Convention Center Corp., Inc.* (2022) 86 Cal.App.5th 589, 597 ["governmental actors enjoy protection from liability under the Labor Code unless a statute specifically brings a public employer within its ambit"]; *Kistler v. Redwoods Community College Dist.* (1993) 15 Cal.App.4th 1326, 1332 [noting that Lab. Code, § 227.3 does not apply to a public employer]; *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 398 [noting general rule that statutory penalty provisions do not apply to public entities].)

34

over the "compensation, method of appointment, qualifications, tenure of office and removal of [their] employees"]; *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 564 ["'Thus there is no question that "salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws."'"].)

Buckman argues that *Association for Los Angeles Deputy Sheriffs* was wrongly decided. Buckman cites a letter dated January 29, 2002, from the Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE) opining that Labor Code section 221 applies to public employers. (DLSE Opinion Letter 2002.01.29, p. 11, fn. 5.) Buckman also cites cases involving the Public Employee Relations Board (PERB) that implicitly support the application of Labor Code section 221 to public employers. (*Berkeley Council of Classified Employees v. Berkeley Unified School Dist.* (2012) PERB Decision No. 2268; see *City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1287-1288; *City of Oakland v. Hassey* (2008) 163 Cal.App.4th 1477.)

*Association for Los Angeles Deputy Sheriffs* presents recent and as-yet uncontradicted authority that Labor Code section 221 does not apply to the city. However, we recognize that the parties did not address this legal issue below, nor in their initial appellate briefs. For this reason, and because Buckman did not have an enforceable agreement with the city as a matter of law, we decline to address in detail the parties' competing arguments

as to whether the relevant Labor Code provisions apply to the city.[7]

### 2. *The city's argument*

Buckman argued her entitlement to the disputed sick leave and vacation time was based on an oral agreement with HCID personnel records supervisor Ruiz. The oral agreement alleged by Buckman resulted in 11.33 hours of vacation time, 96 hours of sick time at 100 percent pay and 40 hours of sick time at 75 percent pay as reflected on her first pay stub. Using the hourly rate shown on that pay stub, this oral agreement would have an initial potential value in excess of $5,366.86.

While the city disputes such an agreement existed, the city argues it is unnecessary to review Buckman's factual assertions as such an agreement would be void as a matter of law. The city claims the alleged oral agreement was unauthorized and unenforceable. We agree.

### 3. *Waiver*

Buckman contends the city waived this argument by failing to raise it until closing argument. Buckman asserts she was thus deprived of the right to challenge this defense during trial, including questioning relevant witnesses about it. However, Buckman's contention of waiver is belied by the record, which shows that the city raised the issue and Buckman filed a brief

---

[7] On May 15, 2023, following our request for supplemental briefing from the parties on this issue, DLSE filed an application to file amicus brief on the issue of whether Labor Code sections 221-223 apply to public employment. Because the applicability of Labor Code sections 221-223 to public employers is not dispositive in this case and was not raised by the parties below, we deny DLSE's application.

seeking to preclude the city from making reference to Los Angeles City Charter (Charter), article III, section 370.[8]  The city raised the apparent lack of authority to enter into the contract in its closing arguments and its request for a statement of decision. Specifically, the city asked whether the court took into consideration that "Marcia Ruiz was not authorized to negotiate accruals of sick and vacation leave."  Therefore, we decline to find waiver.

In addition, we note the question of whether Buckman proved the existence of an enforceable contract is a question of law.  Even if the city failed to raise this legal issue below, we may still consider it on appeal.  (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1187.)  We exercise our discretion to do so.

> **4.** *The oral agreement between Buckman and Ruiz was unenforceable*

Ruiz, a member of the city personnel department staff, communicated with Buckman when Buckman was initially offered the job.  Buckman testified it was Ruiz who offered to retroactively apply Buckman's sick and vacation accrual from the date of Buckman's prior employment with the city.  At the time, Ruiz's title was "Personnel Records Supervisor."  Ruiz was not authorized to negotiate salary with prospective employees, nor

---

[8]  Charter section 370 provides, in pertinent part, that every contract involving consideration reasonably valued at more than the amount specified by ordinance shall be made in writing.  It further provides that the city shall not be bound by any contract unless it complies with section 370.  The provision was raised by the city to support the city's position that the agreement regarding sick and leave time was unauthorized.

was she authorized to negotiate accruals of vacation and sick leave. In its request for a statement of decision, the city asked that the court address the issue of Ruiz's lack of authority to enter into such a contract on behalf of the city. Specifically, the city asked whether the court took into consideration that "Marcia Ruiz was not authorized to negotiate accruals of sick and vacation leave." The trial court's statement of decision did not address the issue.

Buckman admits the accrued vacation and sick time that were offered to her by Ruiz constituted wages. (Citing *Suastez v. Plastic Dress-Up Co., supra*, 31 Cal.3d at p. 779 [establishing that vacation pay is "additional wages for services performed."].) Generally, "[a] public employee is entitled only to such compensation as is expressly and specifically provided by law." (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 22-23.)

California Constitution, article XI, section 10 provides: "A local government body may not grant extra compensation or extra allowance to a public officer, public employee, or contractor after service has been rendered or a contract has been entered into and performed in whole or in part, or pay a claim under an agreement made without authority of law."[9] Based on this provision, public employees who have sought to recover excess

---

[9] We invited the parties to provide supplemental briefing on the applicability of California Constitution, article XI, section 10 to the city's contention that Buckman's claim for failure to pay wages is based on a legally invalid oral contract, and whether the oral contract was "made without authority of law" as set forth therein. Article XI, section 10, applies to charter cities such as the city. (*Nelson v. City of Los Angeles* (1971) 21 Cal.App.3d 916, 918.)

accumulated vacation and sick leave are permitted recovery "only when specifically authorized by a statute, ordinance, resolution, rule, regulation, or contract in effect at the time the work was performed or the leave was earned." (*Seymour v. Christiansen* (1991) 235 Cal.App.3d 1168, 1173 (*Seymour*).)[10]  Buckman points to no such rule in effect at the time of her hiring allowing her to accumulate vacation and sick time starting at the date of her previous employment with the city.  Nor does she identify any individual with the legal authority to provide a bonus of excess vacation and sick time who authorized the oral agreement. Under California Constitution, article XI, section 10, the city "may not" pay a claim under such an agreement, which was apparently made without authority of law.

---

[10]  In *Seymour*, the school district employee demanded reimbursement of personal funds expended as well as unused sick and vacation time accumulated after years of employment. (*Seymour, supra*, 235 Cal.App.3d at p. 1171.)  Thus, she specifically sought "extra compensation" for services rendered *after* her contract was entered into, as set forth in the first clause of California Constitution, article XI, section 10.  The parties disagree as to whether the first clause of California Constitution, article XI, section 10 applies here.  Both parties point to facts in the record supporting their competing positions as to whether the additional compensation in this case was granted *after* the contract was entered into.  We find that we need not resolve this dispute, as the contract was made "without authority of law" as set forth in the second clause of the provision.  (Cal. Const., art. XI, § 10.)

We therefore reverse the trial court's decision on failure to pay wages.[11]

**5.** *Equitable estoppel does not apply*

Buckman argues the city is equitably estopped from failing to abide by Ruiz's oral contract with her. We disagree.

In order for the doctrine of equitable estoppel to apply, the following factors must be present: "'''(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts;

---

[11] The city argues the trial court abused its discretion by excluding from evidence an e-mail exchange between Buckman and Villasenor, which showed the sick time and vacation hours were carried over in error, not due to an agreement. Buckman claimed not to recall the e-mail, but confirmed that the "to" and "from" e-mail addresses were the city addresses of Villasenor and Buckman. The trial court initially admitted the exhibit, then reconsidered, expressing confusion over the "structure." There was no objection to the evidence. The city later attempted again to get the e-mail admitted to evidence using a declaration from the city's Division Manager for Information Technology, but the trial court barred the filing on the ground the declarant was not on the city's witness list. The city made a third attempt to offer the exhibit into evidence in a different format, but the court rejected it after Buckman's counsel objected the document in that format had never been produced before. We decline to address the city's arguments regarding the excluded exhibit, because we find that even if an agreement existed between Buckman and Ruiz regarding extra sick leave and vacation time, Buckman has failed to prove that such agreement was authorized and enforceable as a matter of law.

40

and (4) he must rely upon the conduct to his injury.""" (*Migliore v. Mid-Century Ins. Co.* (2002) 97 Cal.App.4th 592, 606.)

The detrimental reliance of the party seeking to assert equitable estoppel must be reasonable. (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261 (*Schafer*).)

Buckman has failed to meet these requirements. First, Buckman fails to identify any individual in a position of authority within the city who was aware of, or approved, the oral agreement. Thus, there is no evidence that the city knew of, or intended to enter, this purported oral agreement. Further, Buckman cannot show ignorance of the true state of facts. The record shows that Buckman was informed of the city's policy regarding her compensation, including that she was starting with a balance of zero vacation and sick time. Buckman initialed the terms of her employment, including specifically acknowledging she was bound by the terms of the Personnel Procedures Manual, which contained specific provisions details regarding the sick and leave time that she would qualify for upon being hired. Because Buckman failed to speak to any individual in a position of authority regarding her agreement with personnel staff for extra time, and because she was made aware of the city rules regarding sick and leave time for individuals in her position, any reliance on a purported promise from Ruiz was not reasonable as a matter of law.

Finally, we note the doctrine of equitable estoppel """ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy.""" (*Schafer, supra*, 237 Cal.App.4th at p. 1262; see *First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 669 [discussing

41

legal precedent and noting that "[n]o case has ever held that a city may be bound to a contract by estoppel"].) The city has a strong interest in abiding by the terms of its Personnel Procedures Manual in order to avoid inequity in its treatment of employees. Thus, equitable estoppel does not apply.

**6.** *Charter section 370 and Administrative Code section 10.2*

The city "is a chartered city with maximum allowable control over municipal affairs." (*First Street Plaza Partners v. City of Los Angeles, supra*, 65 Cal.App.4th at p. 661.) The legal power and ability of the city to contract is limited by its charter, which requires a written contract for any agreement over the value set by ordinance. (Charter, § 370). During the time period in question, the Los Angeles Administrative Code (Administrative Code), article I, former section 10.2 required contracts valued at more than $1,000 to be (1) made in writing, (2) approved by the city attorney, and (3) signed by the mayor or another authorized official unless an ordinance specifically provided otherwise.[12] The Charter provides that "[t]he City shall not be, and is not, bound by any contract unless it complies with the requirements of this section and all other applicable requirements of the Charter." (Charter, § 370.) The city contends these provisions required the alleged agreement with Buckman to be in writing.

Buckman argues that Charter section 370, Administrative Code former section 10.2, and Los Angeles Ordinance No. 185268

---

[12] The contract limit was amended to $5,000, effective 2018.

do not apply here.[13]  Because the alleged agreement asserted by Buckman was not authorized, the city may not pay a claim on the agreement, as set forth in California Constitution, article XI, section 10.  Thus, we find that we need not address the competing arguments of the parties on this point.

  **D.** ***Attorney fee award***

  Buckman obtained a favorable judgment on four of her seven causes of action, but only one supported recovery of attorney fees—her CFRA retaliation claim.  (Gov. Code, §§ 12945.2, 12965, subd. (b).)  The city argues Buckman was therefore limited to an award of those fees reasonably related to her retaliation claim.  The city claims Buckman made no attempt to allocate her fees, but the trial court, in excess of its authority, awarded all of Buckman's fees regardless of which claim they supported.  The city cites *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129 (*Reynolds*), for the proposition that "[a] litigant may not increase his recovery of attorney's fees by joining a cause of action in which attorney's fees are not recoverable to one in which an award is proper."  (See *Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 555 (*Thompson*) ["a court may not award fees for legal work that is unrelated to a cause of action for which fees are authorized"]; *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 157 (*Graciano*) [directing trial court to consider "whether it could segregate the work . . . counsel performed on

---

[13] Los Angeles Ordinance No. 185268, effective January 10, 2018, increased the value of city contracts required to be in writing and added categories of contracts that were not required to be approved by the city attorney as to form.

43

causes of action for which she was entitled to fees from those for which she was not"].)

Buckman makes two arguments in opposition: first, the city forfeited this argument by failing to raise it below; second, the trial court need not apportion fees where the issues in the case are intertwined. (Citing *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431 (*Wysinger*).)[14]

As the matter is reversed as to two of the four causes of action on which Buckman prevailed below, the attorney fee award should be reconsidered. We find the trial court should consider the question of apportionment in rendering an attorney fee award on remand, including the legal principles set forth in *Reynolds, Thompson, Graciano, Wysinger*, and other applicable authority presented by the parties. The court should also consider the judgment appealed from is in favor of Buckman on only two of her seven causes of action.[15]

---

[14] In *Wysinger*, all claims "involved underlying disability and age discrimination issues" and were "based on 52 paragraphs of facts in Wysinger's complaint, which he alleged were common to all causes of action." (*Wysinger, supra*, 157 Cal.App.4th at p. 431.)

[15] As set forth in part I.C. above, the validity of the judgment in favor of Buckman on the seventh cause of action is legally questionable. However, because the city failed to specifically address this cause of action in its appeal, the judgment in favor of Buckman on the seventh cause of action remains intact. However, the damages and statutory penalties must be reconsidered given that the awards on the sixth and seventh causes of action were intertwined.

## II.    Buckman's cross-appeal

In her cross-appeal, Buckman contends the trial court erred in deducting 203 hours of counsel's travel time and in its application of the lodestar-adjustment method.  Buckman argues these two errors resulted in an inadequate fee award.

The fee award is reversed for the reasons set forth above. We therefore decline to consider Buckman's cross-appeal at this time, as the fee award will be reconsidered in its entirety upon remand.

## DISPOSITION

The judgment in favor of Buckman on her claim for retaliation is affirmed.  The judgment in favor of Buckman on her IIED and lost wages claims are reversed.  The trial court is directed to adjust the damages and penalties awarded to Buckman accordingly.  The award of attorney fees to Buckman is reversed and remanded for reconsideration in light of this opinion.  Each party shall bear its own costs of appeal.

_____

CHAVEZ, J.

We concur:


_____

ASHMANN-GERST, Acting P. J.


_____

HOFFSTADT, J.